WILLIAM HARVEY SLAUGHTER, Defendant Below, Appellant, v. ALBERT I. STAFFORD, Plaintiff Below, Appellee.

(*May* 8, 1958.)

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, J. J., sitting.

*H. Albert Young* and *Bruce M. Stargatt* for appellant.

*David P. Buckson* and *George R. Wright* for appellee.

Supreme Court of the State of Delaware, No. 48, 1957.

SOUTHERLAND, C. J.:

This is a suit by a licensed real estate dealer for recovery of commissions. The complaint alleges that plaintiff Stafford was employed by defendant Slaughter to sell Slaughter's farm at

a price of $100,000; that Stafford procured a purchaser ready, able and willing to buy at that price; and that Slaughter refused to consummate the sale.

The case was tried before the court without a jury. The testimony was conflicting in many respects. The trial judge made the following findings of fact:

"1. Defendant was the owner of a farm near Middletown from March 27, 1947, to February 20, 1956. Defendant's farm was for sale from sometime in the spring of 1954, until a sale was contracted for on October 24, 1955.

"2. A number of real estate brokers in the Middletown area were active in attempting to find a purchaser for defendant's farm.

"3. Prior to this dispute, defendant was a friendly acquaintance of plaintiff's, and he authorized plaintiff to attempt to find a purchaser for the farm. A sale price of $100,000 was mentioned. The arrangement between this owner and broker was not an exclusive one and was not reduced to writing. No definite agreement as to commission was arrived at.

"4. Plaintiff and his associate, George B. Schreppler, Jr., were active in attempts to find a purchaser for the farm, and defendant cooperated with their efforts.

"5. Among the prospects with whom plaintiff or his associate had contact was a Mr. Horace Woodward, the ultimate purchaser.

"6. Mr. Woodward visited the farm for the first time with Mr. Schreppler on or about September 19, 1955.

"7. Defendant knew that Mr. Woodward had visited the property with plaintiff or his associate.

"8. Active negotiations took place between Mr. Woodward and plaintiff or his associate and an offer of a sum of less than $100,000 was made by Mr. Woodward for the purchase of the farm.

"9. Defendant discussed the possible tax consequences of the proposed sale with plaintiff and on September 22, 1955, went with the plaintiff to discuss the matter with a tax consultant in Wilmington. The potential sales price used in discussing the proposed sale with the tax consultant was $100,000.

"10. About this time, defendant became extremely hesitant to sell the farm and stated to plaintiff that he did not wish to do so till consulting with his son who lived in the South.

"11. Thereafter, plaintiff telephoned defendant's son in an apparent attempt to persuade the son to use his influence in connection with the sale.

"12. The defendant and his son subsequently communicated with each other and became angry at plaintiff on account of some uncomplimentary statements made by plaintiff to defendant's son during the telephone conversation.

"13. On September 28, 1955, plaintiff attempted to present defendant with Mr. Woodward's written offer of $100,000 for his farm together with a check for $10,000 deposit thereon.

"14. Defendant refused to have anything to do with the proposed sale, mentioning a higher sales price. At that time defendant made it clear that he did not intend to cooperate further with plaintiff's sales efforts.

"15. On or about October 7, plaintiff, indirectly through defendant's attorney, was informed that defendant had decided not to sell his farm.

"16. Less than three weeks later on October 24, 1955, defendant entered into a contract with the same Mr. Woodward for the sale of the farm at $125,000. This contract was negotiated by Mr. John Heldmyer, Jr., a broker who knew of the prior negotiations.

"17. The sale of the farm to Mr. Woodward was completed on February 20, 1956, and a brokerage fee of 5 per cent was paid by the defendant to Mr. Heldmyer in connection with the sale.

"18. The normal and reasonable rate of compensation to real estate brokers in the locality for this type of sale was 5 per cent of the sales price."

We add to these findings the following additional facts and contentions of the parties:

The interview with the Wilmington tax consultant (Finding 9) took place Thursday, September 22. Stafford called to see Slaughter at the farm Sunday, September 25. It was at this interview that Slaughter said that he wanted to consult his son about the matter. (Finding 10.)

On Monday, September 26, after the telephone calls referred to in findings 11 and 12, Stafford returned to see Slaughter. What happened at this interview is in dispute. Stafford says that Slaughter told him to get a contract of sale for $100,000; Slaughter says that he told Stafford that he would not let Stafford sell the farm at any price, and also told Stafford to get off the farm.

Thereafter occurred the September 28 interview. (Findings 13 and 14.)

The subsequent sale to Woodward (Findings 16 and 17) came about in the following manner:

After Slaughter refused Woodward's offer of $100,000, Woodward withdrew his offer, and Stafford's connection with the matter ended. Woodward, who had consulted Heldmyer about the purchase of the farm, was shown several farms by Heldmyer, but his interest was in the Slaughter farm. He raised his price to $115,000, but Slaughter refused the offer. Slaughter was not told the name of the prospective purchaser.

Thereafter Woodward decided to buy another farm. He called Heldmyer and said that he wanted to get back his deposit check for $15,000, because he was about to close the purchase of another farm that morning. Heldmyer, saying that the check would be available for return to Woodward, suggested to Woodward that he (Heldmyer) show Woodward some other farms.

Woodward acquiesced and they inspected the farms. Woodward concluded not to close his proposed purchase on that day. Shortly after Heldmyer saw Woodward again and persuaded Woodward that $125,000 was a fair price for the Slaughter farm. On October 24 the contract was signed. (Finding 16).

There is no evidence that Slaughter gave Woodward's name to Holdmyer, or employed him to sell the farm, and no evidence that Slaughter attempted to close the sale himself direct with Woodward.

The first question presented by this case is the crucial one. Did Stafford, prior to the revocation of his authority to sell the farm, produce a purchaser able, ready and willing to buy the farm on the owner's terms? If so, he is entitled to a commission at the customary rate. *Delaware Apartments, Inc. v. John J. Monaghan Co.*, 6 *Terry* 75, 45 *Del.* 75, 82, 69 *A.* 2d 242. In that event, the issue of revocation in bad faith before consummation of the sale, discussed by the court below, became irrelevant.

The answer to the question above asked depends upon the resolution of the conflicting testimony respecting the interview of Monday, September 26. At that time Stafford had not met Slaughter's terms. If his testimony is credited, his authority was not terminated, and two days later he produced a purchaser. If Slaughter's testimony is credited, Stafford was discharged before Stafford produced a purchaser on Slaughter's terms, and the case set forth in the complaint was not made out.

The trial judge, in our opinion, did not resolve this question. Slaughter contends that it was implicitly resolved in his favor, because, he argues, unless the court rejected Stafford's version of the interviews, there was no occasion for him to deal with the question of a discharge on bad faith. This argument has some force. There is also some support for it in the opinion below, which speaks of the "summary dismissal of the broker in the middle of his negotiation". This would indicate a dismissal on Monday, September 26. On the other hand, the trial judge

specifically referred to certain contentions of Slaughter, one of which was that the offer was received after Stafford was discharged. Referring to these contentions, the trial judge said: "I do not find these contentions to be facts." The opinion indicates that even if he had found them in defendant's favor the plaintiff should prevail.

In our opinion, this disputed question—whether Stafford was discharged before he produced a purchaser—was not clearly answered by the court below. In the view we take of the case, hereafter developed, it is the point that determines the case.

We turn now to the findings on the basis of which the court found for the plaintiff. In reviewing them we shall assume without deciding, as we think the trial court did, that Stafford's authority to sell the farm was revoked on September 28. The trial judge stated that he found no legal justification for Stafford's dismissal. Referring to the "unpleasant personal feud" between the parties, he added:

"Even if we assume that defendant had reasonably good personal reasons for dismissing the broker, and that he attempted to do so, there was no creditable showing that the circumstances surrounding the alleged dismissal could cause a forfeiture of the fruits of the broker's labors up to that point."

He later found that the dismissal was not in good faith.

He then found that both Stafford and Heldmyer shared "the honor of being procuring causes" of the sale and awarded Stafford a five per cent commission "on the best offer he had obtained".

These conclusions of the trial judge appear to us to be based on two propositions of law that may be stated as follows:

(1) That the revocation, for personal reasons, of a broker's authority under a contract of employment specifying no time of employment, is in bad faith even though the owner has no in-

tention of evading payment of commissions, provided it appears that a sale is shortly afterwards effected by another broker to the customer introduced by the first broker.

(2) That even if he is discharged in good faith, the first broker is entitled to be compensated on a *quantum meruit* basis for his labors in showing the property to the prospective purchaser and obtaining an offer from him.

Neither of these propositions seems to us to be sound. We find little dissent from the proposition that a principal may, for any reason he likes, discharge a broker whose contract of employment contains no definite time, at any time before the broker has met the principal's terms. *Sibbald v. Bethlehem Iron Company*, 83 *N. Y.* 378; 9 *A. L. R.* 1194, annotation. Of course, he cannot dismiss the broker on the eve of a successful termination of negotiations in order to evade the payment of commissions. Such a discharge is said to be in bad faith. But the broker having been granted a reasonable opportunity to perform, "the right of the principal to terminate his authority is absolute and unrestricted, except only that he may not do it in bad faith, and as a mere device to escape the payment of the broker's commission." *Sibbald v. Bethlehem Iron Company*, *supra*.

The difficulty here is that we can find no evidence whatever of bad faith, in the correct meaning of that phrase. There is no evidence that Slaughter sought to consummate the sale direct with Woodward himself, so as to evade his obligations to pay a commission, and no evidence that he even gave Woodward's name to Heldmyer. It is clear that he discharged Stafford because of his resentment at Stafford's remarks about him to his son. And if such discharge occurred before Stafford produced a purchaser at $100,000, Slaughter was within his rights. No principal is required to continue the employment of a broker whose conduct he thinks offensive simply because the broker has almost, but not quite, met his terms. The broker is paid for success; not for trying. See the cases hereafter cited.

We think that there is no evidence to support the finding of bad faith.

■ We also disagree with the second finding of the trial court. It appears to embody the idea that a broker who has shown a property to a prospective purchaser is entitled to reasonable compensation for his labor, even though he does not consummate the sale. This we think clearly unsound. If such a rule were to be adopted, no seller could safely list his property with more than one broker. Compare the remarks of the Supreme Court of New Jersey in *Vreeland v. Vetterlein*, 33 *N. J. L.* 247.

■ There cannot be two "procuring causes" of the sale; and where there are two or more brokers who have non-exclusive listings of the property the one whose efforts predominate in bringing about the sale is entitled to the commission. See *Bridgeport Land & Title Co. v. Langdon*, 101 *Conn.* 553, 126 *A.* 683; *Tomlinson v. Meader, Sup.*, 38 *N. Y. S.* 2d 291; *Watts v. Barber*, 267 *Ky.* 798, 103 *S. W.* 2d 305. We are aware that there are expressions of opinion in some cases that seem to give support to the idea that even though the broker's efforts were not the predominant cause of the sale, yet he earns a commission if he originally found the ultimate purchaser, and the sale takes place in a short time after his efforts have ceased. See, for example, *McCarthy v. McCarthy*, 49 *R. I.* 200, 142 *A.* 142, cited and relied upon below; *Grace Realty Co. v. Peytavin Planting Co.*, 156 *La.* 93, 100 *So.* 62, 43 *A. L. R.* 1096. But we do not agree with this view. The correct rule, in our opinion, is that stated by the Court of Appeals of New York in *Sibbald v. Bethlehem Iron Co.*, *supra*, as follows:

"It follows, as a necessary deduction from the established rule, that a broker is never entitled to commissions for unsuccessful efforts. The risk of failure is wholly his. The reward comes only with his success. That is the plain contract and contemplation of the parties. The broker may devote his time and labor, and expend his money with ever so much devotion to the inter-

ests of his employer, and yet if he fails, if without effecting an agreement or accomplishing a bargain, he abandons the effort, or his authority is fairly and in good faith terminated, he gains no right to commissions. He loses the labor and effort which was staked upon success. And in such event it matters not that after his failure, and the termination of his agency, what he has done proves of use and benefit to the principal. In a multitude of cases that must necessarily result. He may have introduced to each other parties who otherwise would have never met; he may have created impressions which, under later and more favorable circumstances, naturally lead to and materially assist in the consummation of a sale; he may have planted the very seeds from which others reap the harvest; but all that gives him no claim. It was part of his risk that failing himself, not successful in fulfilling his obligation, others might be left to some extent to avail themselves of the fruit of his labors."

Of course there may be cases in which it appears that, notwithstanding formal closure of the sale by a second broker, the first broker was in reality the procuring cause of the sale. But this case is not one of them. We think that the procuring broker was Heldmyer. The facts here are quite similar to those in *Real Estate Enterprises, Inc. v. Collins, Mo. App.,* 256 *S. W.* 2d 286, in which the court held that the original efforts of the first broker with the ultimate purchaser could not be regarded as the proximate cause of the sale. In this case Stafford's connection with the sale ceased after Slaughter refused his contract for $100,000. There was a definite break in the negotiations between Slaughter and Woodward. Heldmyer, who was active in showing Woodward several farms, obtained from the latter an offer of $115,000 for the Slaughter farm. When this was refused by Slaughter, Woodward was ready to buy another farm. It was Heldmyer who finally persuaded him that the Slaughter farm was a good buy at $125,000.

It follows that the court's finding of bad faith, and its finding that in any event Stafford was entitled to a commission for his preliminary labors, must be disapproved.

The case turns, as we have said, on the determination of a simple fact. Was Stafford's authority to sell the property revoked before he brought to Slaughter the $100,000 offer? If it was not, he earned the commission. If it was revoked on September 26, he has no case.

This is peculiarly a question that should be decided by the trial judge. We must therefore remand the case for a further finding on the question above posed, such finding to be based upon the testimony already taken.

If the court finds that the authority of the plaintiff to sell defendant's farm was not revoked until after he had produced a purchaser ready, able and willing to buy on the defendant's terms, the judgment heretofore entered should stand. If the court finds that plaintiff's authority was revoked prior to his providing such a purchaser, the judgment below should be vacated and judgment entered for the defendant.