BELLANCA CORPORATION, a Delaware corporation, Defendant Below, Appellant, v. JOHN G. BELLANCA, Plaintiff Below, Appellee.

(*March* 7, 1961.)

(*Reargument Denied April* 3, 1961.)

WOLCOTT and BRAMHALL, Justices, and TERRY, President Judge, sitting.

*Edmund D. Lyons* (of Morris, James, Hitchens and Williams) for appellant.

*William E. Taylor, Jr.*, for appellee.

Supreme Court of the State of Delaware, No. 10, 1960.

WOLCOTT, J., (for the majority of the Court):

This is an appeal from a judgment of the Superior Court entered on a jury's verdict. The action seeks to recover the

value of John Bellanca's services (hereafter John) in obtaining an ultimate purchaser for certain of Bellanca Corporation's assets (hereafter Bellanca). The complaint as originally filed set forth a claim based upon an alleged express contract between John and Bellanca obligating Bellanca to pay a commission of 5% of the final purchase price. The New Castle plant of Bellanca was ultimately sold for $1,300,000 to Piasecki Aircraft Company (hereafter Piasecki). At the end of John's case, on his motion and over the objection of Bellanca, the complaint was amended to add a second cause of action seeking recovery on a *quantum meruit* basis. The jury returned a verdict of $45,000, plus interest at 5%. Bellanca moved for a new trial and, upon its denial, followed with this appeal.

█ Bellanca's attack upon the judgment primarily is a contention that the evidence is insufficient as a matter of law to permit the submission of the case to the jury. This contention requires us to examine the evidence in the most favorable light to John, and to make all permissible inferences from the evidence in John's favor. We must then determine whether or not there was evidence which, if believed by the jury, would support a finding of liability on the part of Bellanca under either of John's theories. *Nailor v. Maryland, D. & V. Ry. Co.*, 6 *Boyce* 145, 97 *A.* 418; *Kent v. Parker*, 8 *Terry* 151, 89 *A.* 2d 133.

Before proceeding to this, however, we first notice a contention of Bellanca that the trial judge committed error in permitting John at the close of his case to amend his complaint to state a claim in *quantum meruit*. The amendment was allowed under Rule 15(b), *Del. C. Ann.*, in order to conform the pleadings to the evidence. The fact is, of course, that much of the evidence offered in support of John's theory of an express contract with Bellanca was admissible also in support of a claim for a *quantum meruit* recovery. John testified that the express contract for payment of a commission was

agreed upon orally by himself and Baldini, an employee of Bellanca, who had told him that Sidney Albert, the president of Bellanca, had agreed. This was the only offer of proof as to the authority of Baldini to bind Bellanca to such an agreement. Whether or not this was sufficient, we need not consider for John's counsel, either from a superabundance of caution, or from doubt as to the sufficiency of the proof to establish the authority of Baldini, moved to amend the complaint. The grant of the right to amend is now urged by Bellanca as reversible error.

Application to amend the pleadings to conform to the evidence and to permit the decision of causes upon their merits is not of new growth in this State. Indeed, such power is reposed in the Superior Court by Article IV, Section 21 of the Constitution, *Del. C. Ann.* The promulgation of the Civil Rules of 1948 did little more than standardize and make more definite the practice with respect to the allowance of such amendments. See *Kirwan Mfg. Co. v. Truxton,* 2 *Penn.* 48, 44 *A.* 427; *MacFarlane v. Garrett,* 3 *Penn.* 36, 49 *A.* 175; *Saunders v. Cresswell Roll Forming Co.,* 7 *Terry* 329, 83 *A.* 2d 697.

Rule 15 is the same as Rule 15 of the *Federal Rules of Civil Procedure,* 28 *U. S. C. A.* This rule is written upon the assumption that pleadings are not an end in themselves but are designed to assist, not deter, the disposition of litigation on its merits. Motions to amend the pleadings are always addressed to the discretion of the trial judge. A trial judge in his discretion must always permit or deny the amendment by weighing the desirability of ending the litigation on its merits against possible prejudice or surprise to the other side. See 3 *Moore's Federal Practice,* 804, 843.

We think the trial judge properly allowed this amendment. After its allowance no additional evidence was offered in John's behalf and there can be, therefore, no possible prejudice to Bellanca. The only result was to permit

John to argue two alternative theories of his case, the evidence for both of which was in large part at least the same. In our view the amendment was well designed to permit a final disposition of the litigation on its merits. We find no abuse of discretion by the trial judge in allowing it.

We now come to the basic question of the appeal, *viz.*, whether there is evidence in the record to support the verdict. Bellanca argues, by reason of the fact that the amount of the verdict is less than 5% of the purchase price paid, that thereby the verdict in effect is a finding against John on the express contract theory. Indeed, the trial judge apparently held the same view, although it is not so clear to us that a verdict in a less amount than an alleged agreed-upon commission automatically results in a finding of no contract. See 8 *Am. Jur., Brokers*, § 219. In any event, we think we do not reach the question for in our opinion the verdict must be sustained on the *quantum meruit* theory.

Under this theory John seeks to recover the reasonable value of his services in procuring a purchaser of the Bellanca property under principles of law imposing legal relationships under the name of a quasi-contract. Quasi-contractual relationships are imposed by law in order to work justice and without reference to the actual intention of the parties. Fundamentally, it seems, quasi-contractual relationships are based upon unjust enrichment and upon an imposed duty to restore a plaintiff to a former status. 1 *Williston on Contracts* (Rev. Ed.), § 3. One of the more common instances of resort to the law of quasi-contracts is in attempts to recover the reasonable value of services performed under a mistaken belief that the defendant would pay. 1 *Williston on Contracts* (Rev. Ed.), § 36; 2 *Restatement of Agency* 2d, § 441.

A person invoking the doctrine of quasi-contract may recover the reasonable value of his services only if he

establishes that the services were performed with an expectation that the recipient of the benefit would pay for them, and, further, that the services were performed, absent a promise to pay, under circumstances which should have put the recipient of the benefit upon notice that the plaintiff expected to be paid. 5 *Williston on Contracts*, § 1575; 8 *Am. Jur., Brokers*, § 159. We turn to the record to determine whether or not evidence was offered which, if accepted in the light most favorable to John, would have justified the jury in concluding that he had established these necessary factual elements.

■ Initially, we observe that the evidence more than amply sustains a finding that John performed the services for which he claims compensation. Not only did he testify that he, and he alone, interested Piasecki in purchasing from Bellanca, but the two officials of Piasecki who testified corroborated his testimony. In addition, Baldini, an employee and later director of Bellanca, confirmed the fact that the first meeting between Piasecki and himself at which the negotiations ultimately leading to the sale were initiated was arranged by John. There can be no doubt, we think, that the record sustains the conclusion that John procured the purchaser for Bellanca, without which, under no circumstances, could he claim compensation. *Slaughter v. Stafford*, 1 *Storey* 168, 141 *A.* 2d 141.

■ The crucial fact which must be established by John is that notice of his activities in procuring a purchaser for the Bellanca property was given to the officials of Bellanca directly, or that the circumstances were such that the officials of Bellanca should have known or have been put on guard that John was active and expected to be paid. This follows from the rule that a person who knowingly permits another to perform services for him impliedly agrees to compensation for performance unless there is a specific agreement to the effect that the services are to be performed gratuitously. *Restate-*

*ment of Agency* 2d, § 441, Comment c; *Restatement, Restitution*, § 40.

If, therefore, the officials of Bellanca knew, or should have known, of the procuring of the purchaser by John, the law will imply a promise on their part, and through them Bellanca, to compensate John for his services. It is necessary, therefore, to examine the record to ascertain whether or not there is evidence from which the jury could have concluded that the officials of Bellanca were put on notice that John obtained the purchaser and expected to be paid. In so examining the record, we must, of course, consider the evidence in the light most favorable to John.

We think the evidence would permit the jury to have concluded that the following were the facts:

The crucial period in this controversy is June to November, 1956. Prior to this, Bellanca Corporation had been acquired by Mr. Sidney Albert who owned at least in excess of 50% of its more than one million outstanding shares. Bellanca had been transformed by Albert from an aircraft manufactory to a holding company used to acquire ownership of various operating companies. The business of Bellanca was conducted by a board of directors of apparently six members. These directors were Mr. Albert, president, who owned in excess of 50% of the stock; Blythe, executive vice-president, who owned no stock; Rothchild, treasurer, who owned no stock; Baldini, assistant secretary and assistant treasurer, who owned no stock; a Colonel Rydall, who owned no stock, and a Mr. Holland, who owned 200 shares of stock. Albert as majority stockholder nominated and elected Bellanca's directors.

Baldini, who was the company official approached by John, was located in the New Castle office and was comptroller of the New Castle operation. His duties consisted of preparing financial statements of the New Castle plant and

attending directors meetings to report concerning the financial state of that property. He became a director of Bellanca in June, 1956, at about the time the negotiations with Piasecki first started. In addition, Baldini was used by Albert to investigate the financial condition and worth of other concerns which Albert was interested in acquiring. He was relied upon by Albert in valuing the worth of such prospective acquisitions.

Baldini and John for a while were both employed by Bellanca prior to June, 1956, until Bellanca's financial difficulties made it desirable to reduce the number of Bellanca's employees. At this time, some months prior to June, 1956, John was retired.

Some time prior to June, 1956, John learned from Baldini of Bellanca's continuing difficulties and that Albert was interested in selling his controlling interest in Bellanca or, in the alternative, in selling the New Castle plant. John asked Baldini if he would be paid a commission for his services if he found a purchaser. Baldini replied that it would be necessary for him to clear this with Albert and, subsequently, reported to John that Albert agreed to pay a commission. Prior to this, John had frequently inquired of Baldini as to whether or not he could be of assistance in selling any assets of Bellanca, or in locating other properties to be acquired by Bellanca. In at least one instance John informed Baldini of a bank which could be acquired and asked whether or not he would be paid a commission if the purchase went through. This suggested purchase, after investigation, was rejected by the Bellanca board.

In June, 1956, John interested the president of Piasecki in the possibility of purchasing the Bellanca New Castle plant, and arranged a dinner meeting between him and Baldini in Philadelphia, at which dinner John was present. The matter under discussion at that dinner was the possible purchase and the value of the New Castle plant. The meeting

broke up with the understanding that Baldini would collect and submit further data concerning the value of the property. Thereafter, there were telephone calls and informal discussions which culminated in a meeting held in New Castle in October, 1956, at which the final details and arrangements for the purchase of the New Castle plant were agreed to by the president of Piasecki and its attorney, a Mr. Davis, and Bellanca, represented at the meeting by Blythe, Rothchild and Baldini.

Both Piasecki and Davis testified that they believed John was present at the October meeting in New Castle, while Baldini, Blythe and Rothchild denied that John was present. We must assume, however, that the jury concluded to accept the testimony of Davis and Piasecki, and found as a fact that John was present at the October meeting.

Following the October meeting in New Castle, the board of directors of Bellanca named a committee to conclude the sale to Piasecki. That committee consisted of Albert, Blythe, Rothchild and Baldini, a majority of the board of directors. Ultimately, the agreement was concluded and the property sold to Piasecki in November, 1956.

Upon learning of the completed sale, John approached Baldini and inquired about his commission. Baldini replied it would be necessary to take it up with the board of directors and ultimately reported to John that no commission would be paid because there were too many people mixed up in the sale.

These are the facts we believe the jury could have found on this record. These facts, we think, are sufficient to put at least four of the directors and officers of Bellanca on notice that John had procured Piasecki as purchaser, and that, but for his efforts, Piasecki would have shown no interest. We further think that the knowledge that John had done

this was sufficient to give notice to the four officials of Bellanca that he expected to be compensated for his efforts.

We think this sufficient to support the jury's verdict but there are further inferences which the jury could justifiably draw from these facts to help support the verdict. The activities of Baldini in Albert's behalf warrant the inference that he reported fully to Albert on details of various deals and that he must have reported to Albert and his fellow directors the fact that John had interested Piasecki in the purchase ultimately consummated.

The fact that John was at the October meeting in New Castle without objection by any official of Bellanca warrants the further inference that they knew why he was there, *viz.*, as the man who had obtained the purchaser. This knowledge, therefore, warrants the inference that Bellanca's officials either knew at that time or should have known at that time that Bellanca would be expected to compensate John.

Furthermore, the fact that John was at the October meeting without protest from Bellanca's officials, and stayed throughout a meeting at which the most confidential details of Bellanca's financial condition were stated, is a strong indication that all present knew why he was there and that he had a right to be there. But for his interest in the purchase, there was no justification whatsoever for his presence at the meeting, and it is inconceivable, if this not be the fact, that at least one of the three Bellanca directors present would not have objected to the presence of an outsider.

The situation thus is that three of Bellanca's six directors who ultimately voted to authorize the sale had actual knowledge, or knew of facts which made them chargeable with knowledge of John's expectation of compensation. This being so, Bellanca may not now disclaim any responsibility toward him.

There is one further fact which leads to the inference that the Bellanca directors knew of their responsibility to John. Thus, when Baldini told John he would be paid no commission, he gave as the reason that too many persons had been involved in the purchase. This was just not so since, as far as the record indicates, the only persons involved in the negotiations with the exception of John were officers of either Piasecki or Bellanca. John was the only outsider and, hence, the reason given for refusal to compensate him was an outright misstatement of fact which must have been known to the directors of Bellanca.

We note, also, that of the committee of four directors appointed to consummate the deal with Piasecki, at least three were chargeable with knowledge of the facts outlined above and, hence, even though they may not have reported these facts to Albert—something which is inconceivable— nevertheless, a majority of the committee and, indeed, half of the total membership of the board had actual knowledge of the facts which are legally sufficient to charge Bellanca with liability to John.

Therefore, we think that the record contains facts sufficient to support a *quantum meruit* verdict in John's favor, and to require the affirmance of the judgment below.

Bellance next argues that there is no evidence to support the verdict as to the amount of damages. It is argued that the only evidence as to the measure of damage was John's testimony as to a 5% commission, and the testimony of a real estate broker that the usual broker's commission in 1956 was 5%. Since the verdict of $45,000 is substantially less than 5% of the purchase price, which works out to $66,250, it follows, so goes the argument, that there is no evidence to measure the value of John's services.

We think the point without merit. Evidence of the customary charge of brokers is admissible as a measure of

compensation of one who is not a broker, but who in the case at trial seeks compensation for services customarily performed by a broker. 8 *Am. Jur.*, Brokers, §§ 147, 225. It is true that Bellanca objects to consideration by the jury of the testimony of the broker as to commission on the ground that it was admitted into evidence for an entirely different purpose, but we think the argument draws too fine a line. Furthermore, the jury had before it John's testimony that he had been promised a 5% commission. While this was part of the express contract he sought to prove, he was at liberty to sue on a *quantum meruit* and prove the express contract as evidence of the value of his services. 8 *Am. Jur.*, Brokers, § 219; 58 *Am. Jur.*, Work and Labor, § 33.

Bellanca argues apparently that if the jury found liability on its part, it had then no alternative but to render a verdict for the full amount. Such, however, is not the law. Ordinarily, in an action to recover a liquidated sum on an express contract fixing the amount of damages, if the jury returns a verdict in a lesser amount the losing party will not be heard to complain that his adversary should have received the greater sum or nothing. 39 *Am. Jur.*, New Trial, § 148; *Annotation*, 31 *A. L. R.* 1101.

Next, Bellanca argues that John, not having a real estate broker's license as required by 24 *Del. C.* § 2906, is precluded from recovering compensation for services performed in connection with the sale of real estate. § 2906 prohibits any person acting as a real estate broker without having been registered and licensed as required by law. 24 *Del. C.* § 2901, defines a real estate broker as any person who acts for another in the sale of real estate "as a whole or partial vocation."

We think the point not well taken. The cited Code sections do not purport to govern isolated single transactions of brokerage. They are directed toward individuals who engage in real estate brokerage as a full or part time

vocation. The statute has in fact been so construed by the Superior Court in *Trainer v. Deemer,* 5 *W. W. Harr.* 396, 166 *A.* 657. Bellanca attacks the soundness of the *Trainer* case, but we think it correctly decided in the light of general authorities construing such statutes. 8 *Am. Jur.,* Brokers, § 155. We decline to re-examine the question. The authorities cited by Bellanca deal with statutes which in terms, contrary to the Delaware statute, apply to single transactions.

Finally, Bellance argues that the trial judge erred in instructing the jury on the elements of the amended cause of action (*quantum meruit*). These elements as set forth in the particular portion of the charge are: (1) that Baldini had apparent authority relied upon by John to bind Bellanca; (2) that John had reasonable grounds to believe that Bellanca would pay him a commission, and (3) that John's services were the procuring and efficient cause of the sale to Piasecki.

Bellanca argues that these are the elements of a contract implied in fact in contradistinction to a true quasi-contract, which is a contract implied in law irrespective of the actual intentions of the parties. The distinction thus made by Bellanca is, of course, recognized by the authorities, but the clear cut analytical distinction is largely that of text writers. See 1 *Williston on Contracts* (Rev. Ed.), § 3.

We think, however, that while the referred to portion of the charge consists of a jumble of elements, part of which are applicable to a true contract, and part of which are applicable to a quasi-contract, no prejudical error has resulted. We are of this view for the reason that at the conclusion of the charge the jury was told that if it believed that no express contract had been entered into, but that John had rendered valuable services to Bellanca, and that Bellanca had benefited from those services and had no reason to believe that John's services were gratuitous, that judgment should be given for John. This was a correct statement

of the elements of a quasi-contract and, we think, must have cured any uncertainty that had been created. We are not able to examine the charge as a whole to explore the question further for counsel on neither side has seen fit to include the trial court's full charge in their voluminous appendices.

The judgment of the Superior Court is affirmed.

BRAMHALL, Justice (dissenting):

I cannot agree with my associates that the judgment for plaintiff should be affirmed. I would set aside the verdict and enter judgment for defendant.

The majority have held that the agreement for the sale of the total assets of the airplane business of the corporation was made with the full knowledge that the purchaser had been supplied by plaintiff and that plaintiff expected to be paid for his services in so doing. They have also held that, because of such knowledge on the part of defendant, defendant, by implication, has promised to compensate plaintiff for his services.

I do not here question the principles of law enunciated by the majority in support of their conclusions; I question that the facts of this case and the implications which may reasonably be drawn therefrom justify such conclusions. Specifically, I do not agree that the knowledge or notice relied upon by the majority has been brought home to defendant in such fashion as to make it legally responsible to plaintiff in this action.

The property sold by defendant constituted all the assets of its airplane business. Obviously, no apparent authority may be inferred on the part of either Baldini or Albert, or any of the other officers, since only the directors of defendant could authorize such a transaction. *Atlantic Refining Co. v. Ingalls*, 7 *W. W. Harr.* 503, 185 *A.* 885. See *Fletcher on Corporations* (Per. Ed.), § 605. The majority rest their case upon the

alleged ratification on the part of defendant by knowingly accepting the benefits of the transaction, that is, the purchaser found by plaintiff. Of course, if defendant accepted the benefits of plaintiff's efforts with full knowledge thereof, either actual or by implication, defendant would be responsible and the verdict for plaintiff in this case would stand. I agree with the majority that the crucial question is: Did defendant have notice that the purchaser for the business was secured through the efforts of plaintiff? Apparently contrary to the opinion of the majority, I think that because of the fact that the sale was for the whole of the airplane business, such notice must be to the directors, not to the "officials", since the "officials" would have no authority to make the sale.

To support its finding that defendant had notice that plaintiff secured the purchaser for said business and expected to be compensated for his efforts, the majority rely upon certain testimony relating to plaintiff's alleged presence at a meeting at the "plant", along with three of the directors of defendant, at which the terms and conditions of the proposed agreement were discussed. They also attempt to bolster their position by stating that when Baldini informed plaintiff that plaintiff would receive no commission for his efforts, Baldini gave as the reason for such refusal the statement that too many persons had been involved in the purchase of the business, an assertion that was apparently false.

To say that the evidence as to plaintiff's presence at any meeting at the plant, at which three directors of defendant were present, is unconvincing, is an understatement. Although plaintiff testified fully as to all other meetings at which he was present, he was completely silent as to his presence—if he was present—at any meeting at the "plant". The only testimony tending to prove plaintiff's presence is that of Piasecki, the president of the corporation purchasing the business, and Davis, the attorney for that corporation.

Their testimony was that they "thought", but were not certain, that plaintiff may have been present at one of the meetings at the "plant". There is no specific evidence as to which meeting plaintiff attended or that plaintiff made any statement of any nature at such a meeting indicating that he was the finder or that he expected to receive a commission—or, in fact, any other statement whatever—for his services. While I, of course, agree that it was for the jury to determine whether or not plaintiff was present, it seems to me that the complete uncertainty of this testimony, coupled with the fact that there is not the slightest evidence of any assertion on the part of plaintiff at such meeting that he was the finder of the purchaser for which he expected to receive a commission, or that he participated in the discussion to any extent, necessarily must be considered in determining what inference may be drawn therefrom.

I have at least considerable doubt that as a matter of law any notice which may be inferred from the presence of the three directors at this meeting amounted to a legal notice to the corporation. The property involved constituted all the assets of the airplane business of the company. The complete lack of authority on the part of either Albert or Baldini, as far as the sale of this business is concerned, compels plaintiff to rely entirely upon the alleged ratification on the part of the Board of Directors, since a ratification cannot be based upon the imputed knowledge arising out of an unauthorized act of an agent. *Horst Co. v. Grand Rapids Brewing Co.*, 280 *Mich.* 49, 273 *N. W.* 388. See *Fletcher on Corporations*, § 759. Knowledge on the part of a minority of the directors of a corporation is not necessarily imputed to the corporation, even though at the time the minority directors were acting on behalf of the corporation. *Whitewater Tel. Co. v. Cory*, 117 *Kan.* 463, 232 *P.* 609; *Hudson v. Alaska Airlines, Inc.*, 43 *Wash.* 2d 71, 260 *P.* 2d 321. *Edelstone v. Salmon Falls Mfg. Co.*, 84 *N. H.* 315, 150 *A.* 545. See *Fletcher on Corporations*, § 759. Knowledge on the part of a director who is

directly interested in a contract is insufficient to charge the corporation. *Commercial Lumber Co. v. Ukiah Lumber Mills*, 94 *Cal. App.* 2d 215, 210 *P.* 2d 276. Even the fact that in the proper discharge of their duties the directors should have known is not sufficient. See *Fletcher on Corporations*, § 757.

If we assume, as contended by the majority, that the knowledge of plaintiff's presence at this one meeting is imputable to the corporation, I still do not agree that any inference may be drawn therefrom which would be sufficient to impute to the corporation such knowledge of plaintiff's activity on its behalf as to make the corporation responsible to plaintiff for plaintiff's efforts. The mere presence of plaintiff at one meeting proves nothing. The record is silent as to what took place at that meeting or how long plaintiff was present. There is no evidence that plaintiff participated in the meeting. If we should accept certain general statements to the effect that the details of the transaction were fully discussed as having occurred at this particular meeting, then we must also consider that it was generally understood that the price which would be paid for this business was to be net to the corporation. The directors of defendant, with the exception of Baldini, have stated that they never knew of plaintiff's interest in this transaction and have denied that plaintiff ever attended any meeting at which they were present. Under such circumstances, plaintiff would have been clearly under a duty to state unequivocally that he was the finder and that he was expecting to receive compensation for his services.

I fail to see how an inference may be drawn, or that the corporation was put on notice by plaintiff's mere presence at some meeting attended by three directors of defendant, that plaintiff was the finder of the purchaser and that the defendant accepted the purchaser with full knowledge of plaintiff's activities and with knowledge of the fact that plaintiff expected to receive compensation for his efforts. Having no knowledge of plaintiff's activities, these directors might just

as easily have assumed that plaintiff was expecting to be compensated by the purchaser. Unless a broker's position is made clear by some specific statement, it is frequently difficult to determine his exact position in any given transaction. It seems to me, in a case such as this, where the knowledge of the corporation is to be imputed to the corporation, that the circumstances must be such as to warrant a clear inference as to all material facts. *Monaghan, Inc. v. M. Lowenstein*, 290 *Mass*. 331, 195 *N. E.* 101. I do not find such an inference here.

I would set aside the verdict for plaintiff and enter judgment for defendant.