GRAND VENTURES, INC., Plaintiff
Below, Appellant,

v.

Terry M. WHALEY and Holcomb & Salter, a business entity of the State of Delaware, Defendants Below, Appellees.

HOLCOMB & SALTER INSURANCE AGENCY, Defendant Below, Appellee/Cross Appellant,

v.

GRAND VENTURES, INC., Plaintiff
Below, Appellant/Cross Appellee.

Supreme Court of Delaware.

Submitted: March 2, 1993.
Decided: Oct. 19, 1993.

Philip Trainer, Jr. (argued), Jeffrey S. Welch and Amy A. Quinlan of Ashby & Geddes, Wilmington, for appellant/cross appellee Grand Ventures, Inc.

Stephen P. Casarino (argued), Casarino, Christman & Shalk, Wilmington, for appellee/cross appellant Holcomb & Salter Ins. Agency.

N. Maxson Terry, Jr. of Terry, Terry, Wright & Speakman, Dover, for appellee/cross appellant Terry Whaley.

Before VEASEY, C.J., HORSEY, MOORE, WALSH and HOLLAND, JJ. (constituting the Court en banc).

MOORE, Justice.

In this appeal from the Superior Court we address the scope of the Delaware Deceptive Trade Practices Act ("DTPA" or the "Act"), 6 *Del.C.* § 2531 *et seq.* Plaintiff, Grand Ventures, Inc. ("Grand Ventures"), appeals the denial of its post-trial motion for treble damages and attorney fees under the Act, while defendant-appellee Holcomb & Salter Insurance Agency ("Holcomb & Salter") cross-appeals the denial of its motion for a new trial. This action stems from an insurance policy that Grand Ventures purchased from defendant Terry M. Whaley ("Whaley") through Holcomb & Salter. After an extensive fire, Grand Ventures discovered that the policy was not valid, and that Whaley did not have authority to bind the insurance carrier. The jury returned a verdict in favor of Grand

Ventures against both Holcomb & Salter and Whaley. The jury also found that the defendants had violated the Deceptive Trade Practices Act.

■ We conclude that Grand Ventures does not have standing to sue under the DTPA. Therefore we affirm the denial of treble damages and attorney's fees. The Act is intended to address unfair or deceptive trade practices that interfere with the promotion and conduct of another's business. Unlike the Consumer Fraud Act, the DTPA is not intended to redress wrongs between a business and its customers.

Regarding the cross-appeal, we affirm the rulings of the Superior Court on all claims.

## I.

In the spring of 1986, Grand Ventures agreed to purchase the leasehold interest, liquor license, machinery and equipment of a failed restaurant in Rehoboth Beach, Delaware. The new restaurant was to be known as the "Irish Eyes." The president of Grand Ventures, James Kiernan ("Kiernan"), was to obtain insurance for the restaurant, as stipulated in the purchase agreement.

The Insurance Place ("TIP") was incorporated in 1982. Its original shareholders were defendant Whaley, Ronald Stephens ("Stephens") and David Salter ("Salter"). The purpose of the business was to sell any insurance in southern Delaware for which it could become an agent. Stephens was experienced in real estate and Salter in insurance. Whaley was the president of TIP, primarily responsible for sales. Salter was also a principal in Holcomb & Salter.

From its incorporation in 1982 until the late winter of 1983, TIP did not represent any insurance companies. Instead, Holcomb & Salter placed the various insurance policies which TIP generated. TIP would receive monthly commission checks from Holcomb & Salter.

Although Kiernan normally bought insurance through his own Allstate agent, Allstate did not offer the specific coverage that Kiernan sought. Kiernan contacted Whaley at TIP. Kiernan had previously obtained insur-ance at TIP, and he now inquired into the purchase of the insurance for the restaurant.

Kiernan advised Whaley that Grand Ventures had budgeted $2,500 for insurance to provide typical business coverage for fire, liability and business interruption. On April 16, 1986, Whaley presented Kiernan with a binder written on International Underwriters ("International"). The binder stated that the policy coverage was for $70,000. The premium was $3,780. When Kiernan objected that the premium was substantially more than had been budgeted, Whaley responded that the premium reflected the amount of coverage needed, and that Kiernan could lower his premium by proportionally reducing the coverage. At trial, Whaley testified that the premiums written in the binder were quoted to him by Holcomb & Salter.

Kiernan and Whaley met, toured the restaurant, and further discussed the cost of the insurance. Upon examination, Whaley estimated the inventory value at approximately $50,000. Further, Whaley suggested that Grand Ventures insure only 80% of the inventory, thereby reducing coverage to $40,000, for a new premium of $1,800. Kiernan delivered a check for the full premium to Whaley in exchange for an insurance binder, again written on International. After issuing the binder, Whaley claims that he forwarded it to Holcomb & Salter.

In late May or early June of 1986, Kiernan had not received the actual insurance policy from either TIP or International, and asked Whaley about the delay. Whaley assured Kiernan that the restaurant was insured, that commercial policies take a long time to issue, and that there was no cause for concern.

On August 11, 1986, a fire extensively damaged the Irish Eyes restaurant. When Kiernan contacted Whaley about coverage, Whaley stated that the policy had not been received, and that he would give Kiernan a standard policy to review. Later in the week Whaley advised Kiernan that International was so busy that he would adjust the fire himself. By the end of the week, Whaley had not appeared, so Kiernan again contacted TIP. At this time, the secretary at TIP told him that Grand Ventures was not in-

sured and that no policy had ever been placed with International. Kiernan only later learned that TIP lacked authority to bind International.

TIP had financial problems from the beginning and lost money every year of its existence. In 1985 and 1986, premium payments earmarked for TIP's fiduciary account regularly financed TIP's operating account.

Even after TIP began to represent some insurance companies, it continued to place commercial insurance policies through Holcomb & Salter for companies which it did not represent. Although TIP could not bind International, Holcomb & Salter had authority to do so. It was routine for TIP to place insurance with Holcomb & Salter, and also to issue binders for insurance companies that TIP had no authority to bind by placing the insurance through Holcomb & Salter. This practice was encouraged and implemented by Holcomb & Salter.

The court charged the jury as to agency, negligence, the Consumer Fraud Act and the DTPA. Holcomb & Salter took exception to nine of the court's charges, one of them being on the DTPA.

The jury awarded Grand Ventures $70,000 in compensatory damages and $4,000 in punitive damages, apportioning fault at 85% for Holcomb & Salter and 15% for Whaley. In responding to special interrogatories the jury found that the defendants had violated the DTPA, but not the Consumer Fraud Act.

Holcomb & Salter moved for a new trial. Its primary argument was that the Superior Court erred as a matter of law in instructing the jury on the DTPA. Conversely, Grand Ventures moved for pre-judgment interest, costs, treble damages and attorney fees pursuant to the DTPA. The trial court denied the motion for new trial. 622 A.2d 655. Additionally, the court determined that Grand Ventures did not have standing under the DTPA, and denied Grand Ventures' motion for treble damages and attorney fees.

## II.

### A.

■ We first address the question of Grand Ventures' standing under the Act.

When resolving an issue of statutory construction, our scope of review is whether the Superior Court erred as a matter of law in formulating or applying legal precepts. *Delaware Alcoholic Beverage Wholesalers, Inc. v. Ayers*, Del.Supr., 504 A.2d 1077, 1081 (1986). Questions of law are reviewed *de novo*. *E.I. duPont de Nemours and Co., Inc. v. Shell Oil Co.*, Del.Supr., 498 A.2d 1108, 1113 (1985). "In the construction of a statute, this court will establish as its standard the search for legislative intent. Where the intent of the legislature is clearly reflected by unambiguous language in the statute, the language itself controls." *Spielberg v. State*, Del.Supr., 558 A.2d 291, 293 (1989).

### B.

In 1965, the Delaware General Assembly, desiring to protect the interests of consumers and businesses, passed as companion bills the Consumer Fraud Act and the Deceptive Trade Practices Act. The Consumer Fraud Act, 6 *Del.C.* §§ 2511–2526, "protects consumers and legitimate business enterprises from unfair or deceptive merchandising practices." 6 *Del.C.* § 2512. The wrongs that it is intended to remedy, which easily distinguish it from the wrongs addressed by the DTPA, are enumerated in § 2513(a):

§ 2513. **Unlawful practice.**

(a) The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.

6 *Del.C.* § 2513(a).

Retail consumers have an implied private cause of action to recover losses from incidental or specific fraud or deception on the part of merchants. *Young v. Joyce*, Del. Supr., 351 A.2d 857, 859 (1975).

Conversely, the DTPA prohibits unreasonable interference with the promotion and conduct of another person's business. *See* PREFATORY COMMENT, UNIFORM DECEPTIVE TRADE PRACTICES ACT OF 1964 7A U.L.A. 300, 301 (1985). The DTPA is based on the Uniform Deceptive Trade Practices Act of 1964, which the General Assembly adopted in its entirety. The purpose of the Uniform Act is

> to bring state laws up to date by removing undue restrictions on the common law action for deceptive trade practices. As examples of the common law restrictions deleted, the Act specifically makes unnecessary proof of competition between the parties, monetary damages or intent to deceive. Except where the statutory provision and the common law conflict, the Act suggests no intent to replace the common law.

*Sebago Lake Camps, Inc. v. Simpson*, Me. Supr., 434 A.2d 519, 521 (1981) (citations omitted).

While the Act is broader than the old common law action for unfair competition,[1] it nonetheless arises from those concepts of unfair trade practices that interfere with the business of another. This is readily apparent from the deceptive trade practices enumerated in the Act:

### § 2532. Deceptive trade practices.

(a) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or of misunderstanding as to filiation, connection, or association with, or certification by, another;

(4) Uses deceptive representations or designations of geographic origin in connection with goods or services;

(5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;

(6) Represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

(7) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(8) Disparages the goods, services, or business of another by false or misleading representation of fact;

(9) Advertises goods or services with intent not to sell them as advertised;

(10) Advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(11) Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions; or

(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

(b) In order to prevail in an action under this chapter, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

(c) This section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this State.

6 *Del.C.* § 2532.

Remedies under the Act are enumerated in § 2533, which provides:

### § 2533. Remedies.

(a) A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable. Proof of mon-

---

1. Examples of the common law restrictions deleted by the Act are proof of competition between the parties or proof of secondary meaning (6 *Del.C.* § 2532(b)), monetary damages or intent to deceive (6 *Del.C.* § 2533)).

etary damage, loss of profits, or intent to deceive, is not required. Relief granted for the copying of an article shall be limited to the prevention of confusion or misunderstanding as to source.

(b) The court in exceptional cases may award reasonable attorneys' fees to the prevailing party. Costs or attorneys' fees may be assessed against a defendant only if the court finds that he has wilfully engaged in a deceptive trade practice.

(c) The relief provided in this section is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this State. If damages are awarded to the aggrieved party under the common law or other statutes of this State, such damages awarded shall be treble the amount of the actual damages proved.

6 *Del.C.* § 2533.

■ The DTPA, as originally passed, provided injunctive relief to a "person likely to be damaged by a deceptive trade practice of another." 6 *Del.C.* § 2533(a). The Act "provides solely for injunctive relief although damages may also be awarded when otherwise permitted by law...." PREFATORY COMMENT, UNIFORM DECEPTIVE TRADE PRACTICES ACT OF 1964, 7A U.L.A. at 301. However, the Act was not intended to create a new cause of action distinct from the common law protections designed to secure businesses against the deceptive trade practices of others. *See Mars, Inc. v. Curtiss Candy Co.,* 8 Ill.App.3d 338, 290 N.E.2d 701, 704 (1972); *Sebago Lake Camps, Inc.,* 434 A.2d at 521–22.

In 1970, the provision for trebling common law or statutory damages was added to Section 2533(c). 57 *Del.Laws,* ch. 499, at 1340 (1969). The amendment did not state whether it applied to both consumers and merchants or whether treble damages and attorney fees could be recovered in the absence of a claim for injunctive relief.

The issue presented by Grand Ventures is whether a party seeking relief under subsection (c) for treble damages must also have standing to seek injunctive relief under subsection (a).

## C.

Grand Ventures argues that the plain language of Section 2533 is unambiguous and should be literally applied. Specifically, Grand Ventures asserts that subsection (a), which covers injunctions, and subsection (c), which covers damages, are separate, distinct and unambiguous remedies.

■ The test of ambiguity is well settled. A statute is ambiguous if: 1) it is reasonably susceptible to different conclusions or interpretations; or 2) a literal interpretation of the words of the statute would lead to an absurd or unreasonable result that could not have been intended by the legislature. *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.,* Del.Supr., 492 A.2d 1242, 1246 (1985). In the absence of any ambiguity, the language of the statute must be regarded as conclusive of the legislature's intent. *State v. Cooper,* Del.Supr., 575 A.2d 1074, 1076 (1990). The judicial role is then limited to an application of the literal meaning of the words. *Id.; Spielberg v. State,* Del.Supr., 558 A.2d 291, 293 (1989).

First, Grand Ventures points to Section 2533(a) in support of its position, which states:

A *person* likely to be damaged by a deceptive trade practice of another may be granted an ... injunction against it under the principles of equity and on terms that the court considers reasonable.

6 *Del.C.* § 2533(a) (emphasis supplied by appellant). The definition of the word "person" includes, among others, individuals, corporations and governmental entities. 6 *Del.C.* § 2531(a). Grand Ventures offers this as proof that the section does not distinguish between competitor and purchaser. Additionally, Grand Ventures relies on Section 2532(b), which provides that competition among the parties need not be proved, to support its claim of standing as a retail consumer.

Second, Grand Ventures argues that subsection (c) provides relief in the form of damages distinct from subsection (a). The subsection as amended in 1970 gives an "aggrieved party" the right to recover treble

damages when damages are awarded under other statutes or common law. As with the rest of the Act, subsection (c) contains no provision expressly limiting its application to those with a business or trade interest. Grand Ventures argues that a literal interpretation of this section is warranted, and a retail consumer has standing to collect treble damages under the Act.

Conversely, Holcomb & Salter argues that the statute is indeed ambiguous. It points out that "[t]he relief provided in this section *is in addition* to remedies otherwise available." 6 *Del.C.* § 2533(c) (emphasis supplied by appellee). The appellee argues that "relief provided" can only mean the remedy of an injunction specified in subsection (a). Moreover, Holcomb & Salter argues that the use of the term "section" rather than "subsection" indicates that the subsections of Section 2533 are to be read together.

### D.

This Court commented briefly on the DTPA in *Young v. Joyce,* Del.Supr., 351 A.2d 857 (1975), where the purchaser of a house sued the seller and real estate brokers for common law deceit and violations of the Consumer Fraud Act and the DTPA. The Court held that the consumer fraud statute protects consumers, thereby permitting a private cause of action for fraud. In particular, the Court specifically noted that the DTPA, being a codification of the common law of unfair competition, was inapplicable to the facts of the case. *Id.* at 859.

In this case, the trial court found that the DTPA was ambiguous with regard to the standing of consumers, stating:

> Subsection (c), the only provision with a gateway to collect money damages, is susceptible to various interpretations. The critical sentence in § 2533(c) provides '[i]f damages are awarded ... under the common law or other statutes of this State, such damages awarded shall be treble the amount of the actual damages proved.' This subsection itself does not clearly indicate whether one must qualify under subsection (a) in order to seek treble damages under the terms of subsection (c).

> Among the many possible interpretations of the sentence, this Court must determine which of two general constructions the Delaware legislature intended by adding this sentence to the remedial provision of the 1964 Uniform Deceptive Trade Practices Act ("UDTPA") (Act revised 1966). On its face the statute does not clarify which of the following alternative ways of so construing the statute the General Assembly would prefer....

Slip op. at 9.

We agree that the statute itself and its interpretation have resulted in an ambiguity, and the need to resolve that ambiguity creates the duty to search for the legislative intent in the enactment of the DTPA. *See A & P Stores v. Hannigan,* Del.Supr., 367 A.2d 641, 643 (1976).

### E.

The legislative history of the DTPA is inconclusive and consists primarily of a tape recording from a legislative debate. The useful portions of a Senate speech by Senator Carney, a sponsor of the bill, are as follows:

> This is a companion bill to Senate Bill 38 that passed on Monday, the consumer's protection bill, and this is a little bit involving. It is a bill to protect the consumer, also. This bill is to protect, in various ways, 'I might give one example: that would be when the [noise], if an organization, not the American Medical Association, had the initials AMA, would endorse certain drugs, it would undoubtedly cause confusion in the public's mind. The Act to prohibit this type of trade practices [inaudible].

quoted in *Edwards v. William H. Porter, Inc.,* Del.Super., C.A. No. 88C–OC–174, 1991 WL 165877, Herlihy, J. (July 26, 1991).

Although standing was not discussed, the Senator's remarks indicate that the DTPA was intended as a consumer protection bill. However, the interpretation of a "consumer protection bill" can vary. For instance, the prefatory note of the Uniform Act regards the suppression of "unfair competition" as a law ultimately promoting the best interests

of the consumer. By eliminating proof of competition between the parties (6 *Del.C.* § 2532(b)), the legislative notes in the Uniform Act indicate that the provision was intended solely to remove "the enumerated factors as absolute bars to relief" on a common law claim of unfair competition.

### F.

■ After a review of the statute, the legislative intent, and the context of the DTPA with regard to its sister provision, the Consumer Fraud Act, the more reasonable position is that a litigant has standing under the DTPA only when such person has a business or trade interest at stake which is the subject of interference by the unfair or deceptive trade practices of another. An injunction is the traditional remedy for such interference. The enumerated deceptive trade practices of § 2532 make this clear. In a general sense the Uniform Act is designed to protect consumers, albeit indirectly. A mechanism for directly ensuring fair conduct among businesses can have the indirect effect of protecting individual consumers from deceptive trade practices. Correspondingly, the Consumer Fraud Act, as a part of the same statutory scheme, provides direct protection to consumers from fraudulent acts of sellers.

While a fraudulent act, or a pattern of such acts, may constitute violations of both the DTPA and the Consumer Fraud Act, the interests each statute seeks to protect and the injuries they are designed to redress, are different. International is the victim of defendants' deceptive trade practices. They wrongfully traded on International's name. Such activities are clearly proscribed by § 2532 and constitute unreasonable interference with International's business and reputation. These are classic objects of an injunction. International had the right to enjoin defendants' activities under § 2533, and if appropriate, to seek monetary damages.

On the other hand, Grand Ventures was damaged by defendants' misrepresentations, because it bought something from defendants which the latter had no right to sell—a clear case of fraud remedied by an action in common law deceit or under the Consumer Fraud Act, or both, for damages. An injunction offers plaintiff no remedial aspect in these circumstances.

Thus, it is the separate interests which the DTPA and the Consumer Fraud Act are designed to protect, even though the wrongs may be similar, that determine standing under each statute.

■ In short, the most logical interpretation of the Consumer Fraud Act in conjunction with the DTPA is that the Consumer Fraud Act provides remedies for violations of the "vertical" relationship between a buyer (the consumer) and a producer or seller. Damages are the traditional remedy. Conversely, the DTPA addresses unreasonable or unfair interference with the "horizontal" relationships between various business interests. Grand Ventures had only a retail consumer relationship with the defendants. There was no horizontal business or trade interest at stake, as the enumerated deceptive trade practices in § 2532 demonstrate. That significant distinction deprives Grand Ventures, as an insurance purchaser, of standing to seek an injunction under the DTPA. Without such standing one cannot state a cause of action under the DTPA.[2]

### III.

### A.

■ We next turn to the question whether the Superior Court erred as a matter of law in its instructions to the jury on agency. On cross-appeal, Holcomb & Salter contends

---

**2.** This, of course, does not exclude the possibility that a deceptive trade practice may cease, for whatever reason, before an injunction can issue, thus theoretically mooting such relief. Presumably, an injunction could still issue to prevent future wrongs even though damages may be the only meaningful remedy. Whatever the case, standing under the Act flows from the nature of the wrong and that it is, or was, amenable to injunctive relief because of unreasonable interference with another's business interests or relationships protected by the DTPA. Without this basic predicate to standing, a claim for damages cannot be sustained on an independent basis, as Grand Ventures attempts here, under § 2533(c).

that these instructions were confusing to the jury. When determining the propriety of a jury instruction, the question is whether the instruction "undermined the jury's ability to intelligently perform its duty in returning a verdict...." *Haas v. United Technologies Corp.*, Del.Supr., 450 A.2d 1173, 1179 (1982).

The trial court competently explained the concepts of disclosed, partially disclosed and undisclosed principals; the scope of an agent's authority; that the existence of agency is a fact to be proved, but can be implied; and the legal effect of an agent's acts on the principal. The instructions given were sufficient and there was no error. *See Chavin v. Cope*, Del.Supr., 243 A.2d 694, 698 (1968).

Indeed, after hearing the evidence, the jury found that Holcomb & Salter had authorized Whaley to act on its behalf as an actual agent. As such, the factual determination of the jury is fully supported by the record and will not be disturbed. *Haveg Corp. v. Guyer*, Del.Supr., 226 A.2d 231, 233 (1967).

 Holcomb & Salter's next contention is that the Superior Court erred as a matter of law in its instructions to the jury on the correct measure of damages. During trial, although Holcomb & Salter did not propose any jury instructions on the issue of damages, it took exception to eight instructions, including the damages instruction.

The failure to tender a charge that it believed to be suitable during the trial bars Holcomb & Salter's current contention. *Boyd v. Hammond*, Del.Supr., 187 A.2d 413, 417 (1963). Superior Court Civil Rule 51 requires specific objections, which abolished the former practice of general exceptions to all charges. *Chrysler Corp. v. Quimby*, Del. Supr., 144 A.2d 123, 139 (1958). We have stated:

> It is an established rule that when a party is of the opinion that the instructions given by the Court are not sufficiently explicit or that there is omission of something which he feels should be included, he should call the attention of the Court to that fact and tender at least the substance of further instructions which he has requested the Court to give. If he does not do this, he

may not, as a general rule, complain in an appellate court of this omission.

*Alber v. Wise*, Del.Supr., 166 A.2d 141, 144 (1960). Here, Holcomb & Salter is essentially examining "the instructions at [its] leisure, after verdict, and take[s] advantage of any slips of the trial judge in submitting to the jury the contentions and legal principles growing out of the case." *Chrysler*, 144 A.2d at 139.

Having failed to submit instructions on the issue of damages, Holcomb & Salter cannot now complain of the instruction given. In any event, there was no error by the trial court.

### IV.

 Next, Holcomb & Salter argues that the Superior Court erred as a matter of law by not ruling that the expiration of the insurance binder, before the fire occurred, precluded recovery. This is a question of law, which we review *de novo*. *E.I. duPont de Nemours*, 498 A.2d at 1113; *Fiduciary Trust Co. v. Fiduciary Trust Co.*, Del.Supr., 445 A.2d 927 (1982). It is without merit.

The jury found that Whaley assured Kiernan that the binder was in full effect even though it had already expired. The jury concluded, therefore, that Kiernan's reliance on Whaley's representations were reasonable. A contrary finding would, in effect, reward the fraudulent acts of the defendants. The determinations of fact by the jury are supported by the record and will not be disturbed. *See Haveg*, 226 A.2d at 233.

### V.

 Holcomb & Salter argues that the trial court erred in allowing the plaintiff to amend its complaint, after the close of the evidence, to state a claim of negligence when there was allegedly insufficient evidence to establish that Holcomb & Salter owed a duty to the plaintiff. Superior Court Civil Rule 15(b) provides:

> *Amendments to Conform to the Evidence.* When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the

pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

The purpose of the Rule is to encourage the disposition of litigation on its merits. *Bellanca Corporation v. Bellanca*, Del.Supr., 169 A.2d 620, 622 (1961). A decision to permit or deny an amendment is left to the discretion of the trial judge. *Id.*

Whaley testified that he was instructed by the principals of Holcomb & Salter to write insurance on companies for which he was not authorized, and then to forward the applications to Holcomb & Salter for completion. There is sufficient evidence to support the finding that Holcomb & Salter owed a direct duty to Grand Ventures. Under such circumstances an amendment to conform to the evidence was entirely proper. There was no abuse of discretion.

## VI.

### A.

Finally, Holcomb & Salter contends that the Superior Court erred in denying Holcomb & Salter's motion for a new trial because counsel was not provided with jury instructions prior to closing argument in violation of Superior Court Civil Rule 51,[3] and that there were inconsistencies in the verdict. We review a denial of a new trial on an abuse of discretion standard. *Tyndall v. Tyndall*, Del.Supr., 214 A.2d 124, 126 (1965).

### B.

There is support in the record that the trial judge informed counsel of the instructions that were to be read to the jury. Holcomb & Salter contends that the trial court should have provided counsel with written instructions prior to closing arguments. However, nothing in the language of Rule 51

requires that counsel receive written copies of the instructions. The trial judge, by orally informing counsel of the instructions, was well within the scope provided by Rule 51.

Holcomb & Salter also asserts that the court failed satisfactorily to reconcile the claimed inconsistencies in the jury's verdict. A jury has great latitude, and a verdict will be set aside only where the findings are inconceivable and a great injustice has occurred. *Haas v. Pendleton*, Del.Super., 272 A.2d 109 (1970). Holcomb & Salter claims that an apportionment of fault between Whaley and Holcomb & Salter precludes a finding of agency between the defendants.

The jury found agency, and the jury additionally apportioned fault in a notation on the jury sheet. The trial court noted that a finding of a principal-agent relationship may obviate the necessity of ascribing relative degrees of fault. Moreover, it found that no legal error inheres in ascribing relative degrees of fault between two entities merely because the resulting liability, based on their relationship, would render such apportionment superfluous. Thus, the trial court distinguished negligence and a finding of liability, and reasonably harmonized the jury's findings.

We conclude, based upon the broad standard of review of this case, and the reasonable distinction drawn by the trial judge, that the jury's finding should remain undisturbed.

The judgment of the Superior Court is **AFFIRMED.**

---

3. Superior Court Civil Rule 51 provides in pertinent part:
 At the close of the evidence or at such earlier time as the Court reasonably directs, any party may file written requests that the Court instruct the jury on the law as set forth in the requests. The Court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury....