**UNITED STATES of America,
Plaintiff,**

v.

**Lowell M. BIRRELL, Defendant.**

**No. 61 Cr. 692.**

United States District Court
S. D. New York.

May 28, 1968.

Reversed, September 10, 1968 (2d Cir.)

See also D.C., 286 F.Supp. 885.

Robert M. Morgenthau, U. S. Atty., for the Southern Dist. of New York, for plaintiff, Arthur L. Liman, Stephen L. Hammerman, Stephen F. Williams, New York City, of counsel.

The Legal Aid Society, for defendant, Edward Q. Carr, Anthony F. Marra, Leonard H. Sandler, Stephen Singer, New York City, of counsel.

## OPINION

HERLANDS, District Judge:

These proceedings relating to defendant's renewed attempts to be released on bail after conviction and before sentence represent another chapter in the lengthening story of this seven-year old criminal case.

### I

Defendant was indicted on July 20, 1961. The securities transactions involved in the indictment took place during the years 1955 to 1958. For a period of about six and one-half years, from October 5, 1957 to April 23, 1964, defendant remained outside this country, —so far as any American Government officials then knew.

In a vigorously contested jury trial that began on December 4, 1967 and was completed on December 28, 1967, defendant was found guilty on eleven counts (Trial Record, p. 3392). Ten of those counts charged illegal sales of unregistered control stock; and one

count charged violation of the general conspiracy statute. The total maximum punishment receivable by defendant, should consecutive sentences be imposed, is fifty-five years and a $60,000.00 fine.

On the evening of December 28, 1967, after the verdict had been returned by the jury, the Court heard extensive argument on the question whether defendant should be released on bail pending sentence (Tr. 3395 et seq.). Sentence could not be imposed immediately nor even after the customary period required for a pre-sentence investigation and report because it was necessary first to conduct several post-conviction proceedings. These post-conviction proceedings include a hearing to determine whether the Government's case was untainted by "the fruit of the poisonous tree". See United States v. Birrell, 276 F.Supp. 798, 815–817 (S.D.N.Y.1967).

In addition to the details that the Court had learned about defendant and his activities through the extensive trial testimony and numerous exhibits, the Court had before it a particularized nine-page affidavit of Assistant United States Attorney Stephen L. Hammerman (sworn to December 28, 1967) requesting that defendant be remanded pending sentence.

The Court found and concluded that the evidence demonstrated that there was a substantial risk of defendant's flight from this jurisdiction were he to be released on bail and, consequently, that defendant should be remanded. (Tr. 3445)

On February 14, 1968, defendant appealed to the Court of Appeals, seeking to reverse this Court's remand order of December 28, 1967. The proceedings before the Court of Appeals also sought a writ of mandamus directed to this Court. On the same day that the Court of Appeals heard argument, it denied defendant's application on procedural and substantive grounds. The Court of Appeals held that defendant was deemed "convicted" within the meaning of the Bail Reform Act, 18 U.S.C.A. § 3148 and that

the Court of Appeals was "in no way persuaded that" this Court had "abused his discretion". The Court of Appeals further stated: "The only practicable course thus would be for applicant to seek reargument before Judge Herlands on the basis of materials presented to us which were not before him."

On February 15, 1968, defendant brought on a motion for leave to reargue this Court's remand order of December 28, 1967 and for an order, pursuant to 18 U.S.C.A. § 3148 "or the inherent jurisdiction of the trial court", releasing defendant on his personal recognizance or, in the alternative, restoring him to bail not exceeding $15,000.

This notice of motion was made pursuant to a stipulation, also dated February 15, 1968, pursuant to which the entire record that had been submitted to the Court of Appeals by both sides (including all exhibits and memoranda submitted in connection therewith to the Court of Appeals) should be considered by this Court as if they were new motion papers in support of and in opposition to the motion just referred to. The Government also stipulated to accept short notice of motion. The Court approved all of the foregoing stipulations in the interest of expediting the bail proceedings.

The motion for reargument and to release defendant on bail was argued on February 19, 1968. Voluminous motion papers submitted for and against this application have been studied closely by the Court.

Title 18 U.S.C.A. § 3146(b) lists the various matters that the Court should "on the basis of available information, take into account" in determining which conditions of release will reasonably assure appearance. Among these items are: "the length of his residence in the community" and "his record of * * * flight to avoid prosecution or failure to appear at court proceedings".

Title 18 U.S.C.A. § 3146(f) provides that the "information" offered in connection with any order under Section 3146 "need not conform to the rules per-

taining to the admissibility of evidence in a court of law." Hence, hearsay may be considered. The fact that the information is hearsay has some bearing upon the probative value of the information.

Title 18 U.S.C.A. § 3148 relevantly provides that that section is applicable to a person "who has been convicted of an offense and is * * * awaiting sentence". This language has raised the question whether, in the circumstances of the present case, i. e., the pendency of post-verdict proceedings and the postponement of sentencing, defendant has been "convicted". Defendant still claims that he has not been "convicted" as that term is used in Section 3148. The Court of Appeals, on February 14, 1968, has ruled otherwise.

Section 3148 further provides that a defendant who has been convicted and is awaiting sentence "shall be treated in accordance with the provisions of Section 3146 unless the court or judge has reason to believe that no one or more conditions of release will reasonably assure that the person will not flee or pose a danger to any other person or to the community". Section 3148 further provides that "if such a risk of flight or danger is believed to exist, * * * the person may be ordered detained". Defendant argues that, for the reasons set forth in his motion papers, there is no risk of flight.

As noted, defendant was convicted on eleven counts. Defendant's memorandum (dated February 6, 1968 submitted to the Court of Appeals on February 14, 1968 and, by stipulation, re-submitted to this Court) recognizes explicitly (p. 2):

"The jury's verdict is subject to the condition subsequent [sic] the Government successfully litigating hearings already scheduled before Judge Herlands * * *."

■ Defendant then lists four pending post-verdict proceedings. It was defense counsel who originated the characterization that the verdict herein was "a jury verdict of guilty subject to a condition subsequent" (Tr. p. 3400). The

Court adopted that terminology (Tr. pp. 3412–13). The point is that the disposition of the pending post-verdict proceedings constitutes a condition subsequent, not a condition precedent, to the verdict of "guilty".

■ The Court believes that defendant herein has been "convicted" notwithstanding that various post-verdict motions must be heard. Moreover, the fact that the sentencing has been postponed pending the hearing and determination of said motions simply explains why sentence has not been imposed already and defendant is awaiting sentence.

There may be variant interpretations of the word "conviction" depending upon the statutory contexts. However, the plain meaning of Title 18 U.S.C.A. § 3148, is that a defendant whose guilt has been determined by a jury and who has not yet been sentenced, is a person "who has been convicted * * * and is * * * awaiting sentence". Section 3148 covers two alternative situations: the one just discussed and the other where defendant has been sentenced and he has filed an appeal or a petition for a writ of certiorari.

■■ The fact that the verdict might be set aside should it appear, for example, that tainted evidence had been introduced at the trial does not mean that defendant's present status is not that of a convicted defendant. The possibility that the verdict may hereafter be set aside does not transmute the verdict into a non-verdict.

Contrary to defendant's contentions (Defendant's Memorandum, Page 6) that the verdict is a *"partial* verdict" (emphasis added), the verdict is a full and complete verdict. The characterization of the verdict as being "partial" is simply defense counsel's self-willed epithet, more correctly meaning subject to a condition subsequent.

Cases under other statutes holding that "conviction" requires the imposition of sentence and the entry of judgment are manifestly inapplicable to Section 3148. The word "conviction" as used in Section

3148 is not "equivocal", as defense counsel contends (Defendant's Memorandum, Page 7).

The Court has considered all of the cases cited in defendant's memorandum (pages 6 to 7) with reference to the interpretation of the word "conviction". None of these cases involved a statute whose provisions remotely resembled the verbiage of Section 3148.

Thomas v. United States, 121 F.2d 905 (D.C.Cir. 1941), presented the entirely different question of the meaning of the word "conviction" in the context of a local statute relating to the competency of witnesses who have been convicted of crime. In *Thomas*, the Court explicitly stated that it was interpreting "conviction within the meaning of this [statutory] provision", and held that, for purposes of that particular statute, there must either be a plea or verdict of guilty followed by a sentence and judgment. Moreover, in *Thomas* the alleged prior conviction had occurred in a juvenile court and, under local statute, that disposition did not constitute conviction of a crime.

In Matter of O'Neill v. Department of State, 47 Misc.2d 16, 261 N.Y.S.2d 937 (1965), the question involved the revocation of a real estate broker's license. The petitioner had been found guilty of perjury but received a suspended sentence and was placed on probation. The Court held that these facts did not spell out a conviction within the meaning of the particular section of the New York Real Property Law.

In Martin v. State, 30 Okl.Cr. 49, 234 P. 795 (1925), the Court dealt with the question whether a prior conviction could serve to support the increased punishment under a second offender statute and the Court concluded that, for such purpose, a sentence must be imposed to create a conviction.

In De Veau v. Braisted, 5 A.D.2d 603, 605, 174 N.Y.S.2d 596 (2d Dept. 1958), the Court actually held that a person was convicted within the meaning of a New York statute, the Waterfront Act, which prohibited convicted felons from conducting certain labor union activities. The Court reiterated that the general purport of the meaning of "conviction" depends on its statutory context.

In State v. Superior Court, 1 Storey 178, 141 A.2d 468, 471–472 (1958), the question presented was whether the date of conviction or the date of the imposition of sentencing is the "time of conviction" within the meaning of a statute providing that a criminal appeal shall be taken "within five days from the time of conviction". The court held that the date of sentencing is the "time of conviction".

In State v. DeBery, 150 Me. 28, 103 A.2d 523, 524 (1954), the question presented was whether a person whose appeal is pending from a drunken driving conviction has been "convicted" within the meaning of a statute revoking the driver's license of any person "convicted" of certain offenses. The Court held that there was no conviction until the appeal had been completed.

In Solomon v. Shepard Co., 61 R.I. 332, 200 A. 993 (1938), the question presented was whether a person who has been convicted of a crime but has not yet been sentenced has a "conviction" within the meaning of a statute providing that "the conviction of a witness of a crime may be shown to affect his credibility". The court held that there is no conviction under the facts stated.

In Martin v. State, 10 Terry 344, 116 A.2d 685 (1955), the question presented was whether a defendant who pleads guilty has been "convicted" within the meaning of a statute giving a right to appeal to any person "convicted" under the state's motor vehicle law. The court held that the defendant had not been "convicted".

In Blaufus v. People of State of New York, 69 N.Y. 107 (1877), the question presented was whether a person who had been convicted of perjury but was awaiting sentencing was a "convicted perjurer" within the meaning of a statute barring convicted perjurers from being witnesses. The court held that there

could be no conviction where sentencing has not yet occurred.

In State ex rel. Heartsill v. County Election Bd. of Carty County, 326 P.2d 782 (1958), the question presented was whether a person whose appeal is pending from a felony conviction has been "adjudged guilty" of a felony within the meaning of a statute disqualifying convicted felons from voting. The court held that there was no conviction.

In Bubar v. Dizdar, 240 Minn. 26, 60 N.W.2d 77 (1953), the question presented was whether a person who has pleaded guilty but has not yet been sentenced has been "convicted" within the meaning of a statute barring service of civil process on a person brought into the state after waiving extradition on a criminal charge "until he has been convicted". The court held that there was a conviction.

In Jones v. Kelly, 9 A.D.2d 395, 194 N.Y.S.2d 585 (4th Dept. 1959), the question presented was whether a suspended sentence following a guilty plea to a motor vehicle offense amounts to a "conviction" within the meaning of a statute providing that a driver's license shall be revoked where the driver has been convicted of motor vehicle offenses three times within the previous 18 months. The court held that failure to impose a sentence upon a plea of guilty did not prevent the petitioner from being convicted.

Defendant's memorandum (p. 11) insinuates that this Court remanded defendant in order that he be punished immediately by imprisonment and that the Court's statement concerning the risk of his non-appearance was an afterthought.

Defense counsel have taken out of context and distorted the Court's remarks (Tr. 3415 ff) about the possibility of defendant's remaining at large indefinitely. The Court merely adverted to the circumstance that it would give thought to the possibility that post-verdict proceedings might be exploited as a dilatory tactic, when it said (Tr. 3416):

"all the permutations and combinations of motions and special proceedings * * [including] he has to get another lawyer. * * * Mr. Birrell will be at large despite his conviction so long as he has the ingenuity to dream up, rightly or wrongly, all sorts of post-conviction proceedings. * * * I'm not saying that there is no merit to it. I want to give it serious thought."

At the very outset of the argument, the Government raised the issue of the risk of defendant's flight in these terms (Tr. 3396–3397):

"* * * this is a man who not only absented himself from the jurisdiction but fled the jurisdiction, and knowing that a bench warrant was outstanding from this very court from Judge Sugarman made surreptitious trips into the jurisdiction on various occasions and then fled again. He had all the opportunity even prior to his entrance into Brazil to return to this country and never availed himself of that opportunity. He absented himself for almost six years, your Honor, and I do not think that the Court should take the risk of this defendant's absenting himself for any further length of time."

In the course of the argument the Court squarely defined "the only question" before it as "whether there's a substantial risk of non-appearance" (3407–3408) and "We're dealing here with questions of risk—risk of appearance, risk of flight. Motive for flight" (3410). And at 3412, the Court (after detailing its reasons) observed: "So you can't use my extending his bail limits as a testimonial to his being a good risk, under present circumstances."

In the course of the argument and discussion had on the night of December 28, 1967 in connection with the Government's motion to remand defendant, the Court explicitly referred to the fact that defendant "should be available to counsel" (Trial Record p. 3414) and that "arrangements can be very easily made for him to examine the files" (Tr. p. 3414). The Court stated that it would "deal

with" the situation when defendant "may want to get to those files" and that that constituted "another aspect of the matter that has to be considered realistically" (Tr. p. 3415).

In accordance with the views expressed by the Court on the night of December 28, 1967, there has been a full and complete implementation of the Court's objective that defendant and his counsel should be able to confer and to examine the files conveniently and with a minimum of restriction. Subsequent to December 28, 1967 and up to April 22, 1968 (at which latter date proceedings were initiated to determine defendant's physical and psychiatric condition) defendant was brought to the courthouse daily, whenever he or his attorneys desired. He and his counsel have been afforded a private conference room in the witness room adjacent to Courtroom 1105 and later in the jury room adjacent to Courtroom 519. Special arrangements have been made to have him brought to the Courthouse in the United States Marshal's first van and to remain in the Courthouse evenings; special arrangements for his meals were similarly made to serve his convenience and that of his counsel. The files which are presently located in Rooms 607K and 607L have been made fully available to defendant and his counsel, and appropriate facilities of desks, furniture, filing cabinets, etc. have been furnished to defendant and his counsel. Two large offices (Rooms 9 and 10) on the ground floor of the courthouse have been made available for the exclusive use of defendant and his attorneys since February 29, 1968. In a very real and practical sense, defendant has spent all of his weekdays (until April 22, 1968), from morning to evening, in the offices in the courthouse that have been made available to him and defense counsel in order to prepare for the pending proceedings,—despite the fact that defendant had been remanded to the Federal Detention Headquarters.

These arrangements, which have been and still are in full force and effect and which will be continued throughout the preparation for and conduct of the post-verdict proceedings, constitute special conditions that have ameliorated the fact that defendant is in custody.

Defendant, in his motion papers submitted to the Court of Appeals and now to this Court, does not mention a word about these arrangements. Under the standing arrangements, the Court has fully accommodated defendant's rights to counsel and to prepare for the hearings and the public interest in avoiding the serious risk of defendant's flight.

## II

On October 4, 1957, defendant was served with a subpoena to appear as a witness in SEC v. Swan-Finch Oil Corporation, et al., on October 7, 1957. He immediately proceeded to Havana, Cuba. On October 7, 1957 and on the various adjourned dates thereafter, until November 20, 1957, when the Hon. Sidney Sugarman ordered the issuance of a bench warrant, defendant (through counsel) sought to explain his failure to appear on the ground that he suddenly fell ill on October 5, 1957 and, at least through November 20, 1957, that he remained too ill to return to New York (see Stenographer's Minutes C. 154–351, for November 1, 4 and 20, 1957, attached to the affidavit of Assistant U. S. Attorney Williams sworn to March 25, 1968).

In view of the timing of this abrupt but convenient illness, and in view of the fact that defendant abandoned the services of Dr. Usategui, his Havana physician, on October 16, 1957, the Court finds that Birrell feigned illness for the purpose of avoiding the processes of this Court.

To prove the continuity of his illness, defendant offers a certificate of Dr. Usategui dated October 29, 1957, which was submitted to Judge Sugarman on November, 1, 1957. Inasmuch as Dr. Usategui had not seen defendant subsequent to October 16, 1957, the doctor's opinion as to defendant's health for any period thereafter was no more than a projection based upon out-of-date observations.

Moreover, Dr. Usategui has made it clear that his October 29, 1957 certificate was based exclusively upon verbal declarations of defendant and his associate, Hector Rivero.

On March 25, 1968, Assistant U. S. Attorney Williams spoke over the telephone with Dr. Usategui, who told Mr. Williams the following:

"On October 5, 1957 I visited Lowell M. Birrell in his apartment in Havana, at the request of my brother-in-law, Hector Rivero. At that time Birrell told me that a New York doctor (whose name he did not furnish) had told him that there was something wrong with his heart. I performed certain checks on Birrell on that day, and also on October 9, 1957, in my office, and also at the Sacred Heart Hospital during the period October 14–16, 1957. None of these tests indicated that there was anything whatsoever wrong with Birrell's heart. The fact that I found nothing organically wrong with Birrell is reflected in my deposition of February 16, 1959 (Q & A 105, 136) [Attached as Exhibit H to the Portnoy affidavit of February 5, 1968]. It is further reflected in my affidavit of January 26, 1959, which was prepared by Birrell's attorney, Mr. Sydney A. Hellenbrand, and which I modified to make it clear that my conclusions about Birrell's health related exclusively to his mental condition. [A copy of Dr. Usategui's January 26, 1959 affidavit is attached to defendant's affidavit of March 7, 1968.]

"What led me to believe that Birrell's mental health made it dangerous for him to travel or conduct business was primarily my conversations with him. The substance of what he said suggested depression, and his manner was negative and withdrawn. The only other fact upon which my conclusions were based was information received from Hector Rivero to the effect that during the period immediately preceding October 5, 1957 Birrell had been working exceedingly hard.

"I subsequently learned from the woman who operated the telephone at the Sacred Heart Hospital that during the period when Birrell was a patient under my care there he used the telephone so much that he incurred a phone bill of several thousand dollars. In the light of this fact, it seems almost certain that I was deceived in my view that active conduct of business would be dangerous for Birrell."

Although defendant never saw Dr. Usategui after October 16, 1957, defendant transmitted purportedly current medical bulletins to Judge Sugarman long thereafter. Thus, on November 4, 1957, his counsel, Mr. Richard Wels told the Court:

"Now so far as Mr. Birrell's medical situation is concerned, he saw the doctor yesterday or had the doctor come to see him at his apartment, and the doctor says that it is absolutely essential that under this regimen he must stay put until he has lost another 15 pounds. He is losing at the rate of about one pound a day. In about two weeks' time he would be at that stage where the doctor would then make additional x-rays and additional checks and will then be able to tell us without any questions as to when he can be here. He may be able to be here very shortly thereafter."

Similarly, on November 20, 1957, Mr. Wels stated:

"When I returned from London yesterday afternoon, I telephoned to Havana, nevertheless, for the purpose of ascertaining the current status of Mr. Birrell's physical condition, in case your Honor requested it, so that I might be able to make a report to you.

"I am told that he has made progress. You will recall that when we were first here before you on November 1st, that the medical statement of the physician under whose charge he was, indicated that about 60 days more was required for medical treatment and that he would try to speed that up.

"I am told that progress has been made; that the doctor is still very much concerned about a large area of fatty tissue around the heart which has still not liquidated, and that he estimates that it will be necessary for about another two weeks of treatment before that can be done, and that if it has not disappeared by then steps in the nature of surgery might be necessary. That is the status with respect to his health."

Confronted with the facts that he had ceased to engage the medical services of Dr. Usategui on October 16, 1957 and that Dr. Usategui had found nothing whatsoever wrong with his heart, defendant has now invented an additional doctor. Birrell would have the Court believe that this new doctor, who remains nameless, is responsible for the diagnoses referred to by Mr. Wels.

In the Court's opinion, this newly discovered doctor is pure fiction. Had such a doctor existed, Mr. Wels would have furnished his certificate to Judge Sugarman, rather than the October 29, 1957 certificate of Dr. Usategui, and would have obtained his affidavit when he was preparing defendant's defense in the contempt action, instead of Dr. Usategui's January 26, 1959 affidavit.

Moreover, if any such doctor had existed it seems virtually certain that he would have consulted with his predecessor, Dr. Usategui, in order to discover what findings the latter had made and what steps he had recommended for defendant. Dr. Usategui, however, stated to Assistant U. S. Attorney Williams over the telephone on March 25, 1968:

"At no time did any doctor make any inquiries to me as to what tests I had performed on Birrell in October, 1957, what the results of such tests were, or what I had prescribed for Birrell by way of remedy. While I cannot say for certain that no other doctor attended Birrell in October or November 1957, I can say that no

such doctor ever communicated with me."

Inasmuch as defendant does not identify the newly discovered physician by name, it is impossible for the Government to furnish an absolute refutation of his claim. Circumstantial evidence, however, indicates overwhelmingly that the doctor is a recent invention, created in order to bolster defendant's pretense that illness prevented his compliance with the subpoena of this Court.

Incidentally, defendant swears that he applied for "a permanent residence in Cuba" early in 1957 and that he was employed there as "a consultant in connection with the Havana Race Track". (Defendant's affidavit of March 7, 1968, paragraph 82). In attempting to explain his having been seen at the racetrack in November 1957 (when he was supposed to be ill), defendant ambiguously suggests that he probably went there for medical reasons (Defendant's Affidavit of March 7, 1968, paragraph 61).

Even if health prevented defendant from returning in October and November 1957, his failure to do so (except clandestinely) in the spring of 1958, when he was admittedly well enough to travel, proves his readiness to abscond from the jurisdiction of United States courts.

Defendant now claims that he was under no obligation to return and to appear before Judge Sugarman in 1958:

"On top of which, at no time did I make any promises or commitments to Hon. Judge Sugarman except at a much later date, and as to these matters the government has been and is suppressing the exculpatory material in its possession" (Defendant's Affidavit of March 7, 1958, p. 17).

Thus, defendant simply repudiates the representations of his counsel, Mr. Wels, who told Judge Sugarman on November 4, 1957:

"Your Honor, Mr. Birrell has assured me—he has asked me that I

may assure your Honor that immediately upon Mr. Birrell's return to health he will immediately present himself here for such examination as the Court may require" (C. 154–351, minutes of November 4, 1957, p. 35).

After SEC counsel had alluded to information that defendant contemplated leaving Cuba for Europe, Mr. Wels proclaimed:

"I have no indication whatever, your Honor, that Mr. Birrell has any intention of going to Europe.

"Mr Birrell has told me that as soon as he is permitted by his doctor to leave Cuba he is coming to New York because he has many pressing problems to take care of here" (C. 154–351, minutes of November 4, 1957, p. 37).

And on November 20, 1957, Mr. Wels said:

"Your Honor, I can assure your Honor that as soon as he is able to he will be in New York and that he will make himself available" (C. 154–351, minutes of November 20, 1957, p. 43).

The existence of the obligation to return, and of defendant's wilful flouting of the obligation, are further established by his clandestine visits to the United States in April, May and June 1958. Defendant himself admitted the April 1958 visit to Stephen P. Duggan, Esq. and Rogers Doering, Esq. of Simpson, Thacher & Bartlett, in an interview with them, in the presence of his attorney, Sydney A. Hellenbrand, in January 1961. The Simpson Thacher & Bartlett memorandum of that interview states:

" * * * On April 26, 1958 he [Birrell] was given a permit to reside permanently in Brazil. At about this time the U. S. Supreme Court decided that the bench warrant issued by Judge Sugarman was valid and on the same day this decision was rendered Birrell returned to the United States. He left Brazil on April 26, stopped at San Juan, Puerto Rico on the 27th, was in New York on the night of the 27th and in Canada on April 28th, where he reported to his employers, Jeanette Minerals. He admits that he went through the United States as fast as possible to avoid action on the bench warrant but maintains that he was always anxious to reach a hearing on the merits. In May he met Hellenbrand and arranged for Hellenbrand to represent him in the contempt proceedings." (See Exhibit B attached to Mr. Williams' affidavit, p. 3).

Defendant states that his 1955 United States passport and his document of permanent residence in Brazil "belie completely" the Government's proof of this April 1958 visit (Defendant's Affidavit of March 7, 1968, p. 17).

In fact, his passport (a copy of which is attached as part of Exhibit D to the Portnoy Affidavit of February 5, 1968), shows that he arrived in San Juan, Puerto Rico on April 27, 1958 and in Canada on April 29, 1958, thus corroborating Messrs. Duggan's and Doering's report of his admission.

In addition, defendant was seen in the United States by William H. Mears on May 21, 1958 and by Joseph W. Crosby on June 28, 1958. (Attached to Mr. Williams' affidavit as Exhibit C are photocopies of certain pages of the transcript of testimony of Mr. Mears, given pursuant to Section 167 of the Bankruptcy Act, 11 U.S.C. § 567, in Matter of Equitable Plan Company, Debtor, on February 8th and February 9th, 1960. Attached to Mr. Williams' affidavit as Exhibit D are photocopies of pages 1192–95 of the testimony of Mr. Crosby, also given pursuant to Section 167 of the Bankruptcy Act, in Matter of Equitable Plan Company, Debtor, on May 12, 1959.)

Unable to truthfully deny these accounts of his May and June 1958 visits here, defendant states only: "I have no recollection of seeing either Mr. Mears or Mr. Crosby in the Southern District of New York while the Sugarman con-

tempt matter was pending." (Defendant's Affidavit of March 7, 1968, p. 31).

Defendant contends that certain memoranda of Judge Sugarman to his counsel and to SEC counsel, Mr. Jack Devaney, corroborate his contention that he was under no obligation to return. Whatever the import of those arrangements, it is clear that they in no way justify defendant's evasions of Judge Sugarman's bench warrant in the spring and summer of 1958.

Defendant's suggestions that the United States Attorney's office has suppressed exculpatory material in connection with the contempt matter are without basis in fact, as Mr. Williams' affidavit demonstrates.

On July 8, 1959, defendant's indictment by a New York County Grand Jury received widespread publicity. (See Exhibit F and G attached to Mr. Williams' affidavit.)

On July 12, 1959, defendant left Lisbon, Portugal, and headed, according to himself, for Brazil (Defendant's Affidavit of March 7, 1968, p. 20). In view of defendant's notoriety and the widespread network of associates evidenced to the Court at the December 1967 trial, the Court is of the opinion that he was aware of the indictment by July 12, 1959, and that his journey to Brazil was a direct result of that awareness.

Moreover, even by defendant's own account, he learned of the indictment in Cuba, before taking off from Cuba for the Dominican Republic and before proceeding from the Dominican Republic to Brazil (Defendant's Affidavit of March 7, 1968, pages 44, 51–52). If his desire to clear his name had been as powerful as he now suggests, he would have headed toward New York as soon as possible. This, even by his own account, would have been when he reached the Dominican Republic.

Defendant contends that, because he had become a "permanent resident of Brazil" in April 1958, it was natural for him to proceed to Brazil on July 12, 1959 (Defendant's Affidavit of March 7, 1968, p. 20). However, defendant's "permanent residence in Brazil" was only a formality until after the New York County indictment. As he himself states, immediately after obtaining formal permanent residence in Brazil in April, 1958, he proceeded to Canada and there remained for the next 13 months (Defendant's Affidavit of March 7, 1968, pages 20–21; see also defendant's statements to Messrs. Duggan and Doering, Exhibit A, page 3, attached to Mr. Williams' affidavit).

Defendant argues that his prolonged stay in Canada is consistent with his purported attachment to Brazil, explaining that he had to consult with his principals in his Brazilian employment and to prepare for the criminal contempt action.

The Court rejects as incredible defendant's explanation for his stay in Canada. The Court finds that Birrell sojourned in Canada because there he could continue to control his North American enterprises, while at the same time being sufficiently beyond the reach of the United States law enforcement officers so that he could proceed to Brazil when and if he needed the additional shelter provided by Brazil's lack of any extradition treaty with the United States.

It is significant that with reference to his Canadian passport application dated March 25, 1959 (accompanied by his photograph), defendant signed it as "L. McAfee," gave has marital status as "Single," and stated his "Permanent Address" as "2219 Prudhomme Ave., Montreal." The application is stamped "Canadian citizen."

Nevertheless, defendant blames the airline steward for his use of the name "L. McAfee" and for his stating his nationality to be "North American" (instead of "U. S. A.") when he entered Cuba. (Defendant's Affidavit of March 7, 1968, paragraph 93).

Birrell's remaining in Brazil from July, 1959 to April, 1964 on its face represents overwhelming evidence of his

determination to avoid American justice. Defendant has endeavored to attribute that failure to legal entanglements in Brazil arising out of his arrival in Brazil with two passports, one a United States passport issued in March, 1959 in his own name, the other a Canadian passport in the name of "Lowell McAfee." The Court rejects this explanation as utterly implausible because: (1) Defendant's excuse for being in possession of the false Canadian passport is unequivocally contradicted by the documentary record; (2) Defendant's presentation of both passports to the Brazilian authorities was completely unnecessary, its only purpose was to contrive the resulting legal problem; (3) Defendant made no effort to resolve the legal obstacles to his return to the United States; and (4) Birrell's statements in Brazil demonstrate that once the legal obstacles were removed, Birrell would find others.

Defendant contends that he had the false Canadian passport at the time of his arrival in Brazil only because his Portugal-Brazil flight unexpectedly descended in Castroite Cuba and that he had to obtain the passport in order to effect his escape. With respect to his supposed stopover in Cuba enroute from Lisbon to Brazil, defendant avers: "From Camaguey I arranged the Canadian passport and left Cuba from that airport with a L. McAfee tourist card and a passport which conformed in the name of L. McAfee, North American" (Defendant's Affidavit of March 7, 1968, p. 48). The Canadian passport application (a copy of which is attached to Mr. Williams' affidavit as Exhibit H) is dated March 25, 1959, and reflects the issuance of the passport on April 4, 1959. It is evident that defendant had arranged for that passport months before the alleged stopover in Cuba.

In a fatuous effort to account for the earlier date, defendant makes the following extraordinary statement (Defendant's Affidavit of March 7, 1968, p. 39):

"The Canadian passport was delivered to me by friends from Canada while I was in Cuba in July of 1959. The details of how it was secured I do not know."

Defendant then adds: "I am not at liberty to reveal, without hurting someone, how the passport was delivered to me, * * * ".

In fact, when the passport was secured (early April, 1959), defendant was himself present in Canada, as he now admits (Defendant's Affidavit of March 7, 1968, p. 21).

The fact of defendant's *de facto* residence in Canada during this period coupled with the fact that he then claimed Brazil as his "permanent residence" contradicts his alternative explanation for the passport, offered at the oral argument of this motion on February 19, 1968—that it was an appropriate security precaution for an American living in Cuba (PT–369).

Defendant acknowledges that, on arrival in Brazil, he presented both passports, with their conflicting identities and nationalities. Defendant asserts that, because he left Cuba under the name "L. McAfee" (a fact obviously beyond verification), he was required to maintain that identity both on arrival in Cuidad Trujillo and on leaving Cuidad Trujillo: "Under the unusual circumstances then existing, I was not about to press my good fortune, so I bought a ticket and arranged to continue to Brazil as L. McAfee." (Defendant's Affidavit of March 7, 1968, p. 52). The Court regards this contention as a *non sequitur*. His arrival in a country then sheltering Castro's foe, Batista (Defendant's Affidavit of March 7, 1968, p. 51), did not require him to maintain the same pretense that he had used purportedly to escape from Castro himself.

The Court rejects as incredible defendant's proffered explanation of why five years were required to resolve the legal problems arising out of the manner of his entry into Brazil in 1959. The Court cannot accept defendant's

*ipse dixit* that his "efforts to dispose of this proceeding and secure an exit visa were many, constant and sincere" (Defendant's Affidavit of March 7, 1968, p. 55). This is a bald and uncorroborated assertion.

Defendant describes various obstacles blocking his supposed efforts to clear the way for his return to the United States. The first is, "the distance from Rio [to the state of Para, where the illegal entry proceedings were pending], and the unsettled political situations in Brazil during the years 1962, 1963 and 1964" (Defendant's Affidavit of March 7, 1968, p. 24). From this far fetched assertion, defendant proceeds to offer another factitious story: that the United States Government tried to prevent him from leaving Brazil (Defendant's Affidavit of March 7, 1968, pp. 26, 32, 38, 50, 55 and 59), and that the Government stole the Brazilian court file relating to his illegal entry into Brazil in July 1959 (p. 55). Support for these fantastic charges consists only of vague allusions to supposed admissions by the United States consul in Rio to defendant's attorney, Sydney A. Hellenbrand (see Defendant's Affidavit of March 7, 1968, p. 50) and by a "person connected with the U. S. Embassy in Brazil" to Birrell himself, "when he [the Embassy official] was under the influence of a considerable amount of alcohol" (Defendant's Affidavit of March 7, 1968, paragraph 51). The person who supposedly spoke to defendant is not identified; and Mr. Hellenbrand's March 6, 1968 affidavit (attached to Defendant's Affidavit of March 7, 1968) conspicuously omits any mention of the admission by the American consul.

Even if there were a fully documented record of efforts by defendant to overcome the problems created by his illegal entry into Brazil, the Court is of the opinion that he would have found further obstacles as long as he thought it was in his interest to do so. The affidavit of former Assistant United States Attorney Peter H. Morrison, sworn to March 25, 1968, shows that as soon as elimination of the legal obstacles became imminent, defendant revealed another problem, formerly unmentioned: his determination, as an "honorable man", to pay his debts in Brazil before he left. Defendant was happy to reside in Cuba and Canada in the period from October, 1957 through May, 1959 (with brief intervals in Europe and Brazil), at a time when he was obviously free to come back to the United States and when the corporations which he had controlled, Equitable Plan Company and Swan-Finch Oil Corporation, were attempting to trace their vanished assets. The Court regards defendant's purported solicitude for his Brazilian creditors as spurious.

The factor triggering defendant's return to the United States was the imminence of the final ratification of an extradition treaty between the United States and Brazil. The treaty was signed January 13, 1961; ratifications were formally exchanged November 17, 1964. (See Supplemental affidavit of Assistant United States Attorney Stephen L. Hammerman, sworn to September 19, 1967, submitted in opposition to defendant's pre-trial motions returnable August 29, 1967).

Defendant has manifested an attitude that can be described only as one of defiance and disrespect of legal process and the Court. For example, defendant's appeal from this Court's remand order of December 28, 1967 was heard before the Court of Appeals on February 14, 1968. As already noted, the Court of Appeals decided against defendant both on procedural and substantive grounds. He has characterized the hearing on February 14, 1968 before the Court of Appeals as the " 'Valentine's day Massacre' of my [his] appeal from the remand" (Defendant's letter to Circuit Judge Harold R. Medina, dated April 21, 1968; also, Defendant's letter to this Court, dated April 20, 1968) and as "the hearing ('Valentine's day slaughter') before the Circuit Court" (Defendant's Affidavit, sworn to March 7, 1968, paragraph 22).

In the above letter to Circuit Judge Medina, defendant makes the following remarks about Chief Circuit Judge J. Edward Lumbard:

"The Chief Judge (Lumbard, C. J.) has written at least one opinion involving me and my character, which is so violent in obiter statements as to indicate prejudice; also I carried on a one-sided correspondence with the Chief Judge when I was previously incarcerated in default of bail, which confirms such prejudice * * *."

In another letter to Circuit Judge Medina dated May 7, 1968, defendant states that his "unanswered entreaties" to Chief Judge Lumbard while incarcerated in 1964–1965 has resulted in "writers cramp".

In his above-mentioned letter of April 21, 1968, defendant states that "[S]everal of the other Circuit Judges" have been involved in cases where there are opinions "where conclusory statements of my [his] character have been made although not required."

In the same letter, defendant remarks that he has not written to Chief Judge Sidney Sugarman of this Court because "Hon. Sidney Sugarman is suing me for criminal contempt and in connection with another recent application has just refused to reply to a reasonable request."

In a letter to Chief Judge Sugarman, dated April 24, 1968, defendant criticizes the Chief Judge for his "accomodation [sic] of the United States Attorney's office in my [his] case. Why was not the contempt case gotten out of the way instead of being held over my head in an improper way in the bail applications."

In his affidavit of March 7, 1968, pages 16–17, defendant states that "this criminal contempt proceeding is a personal litigation between the Hon. Judge Sugarman and myself, * * *."

In another letter to Chief Judge Sugarman, dated March 11, 1968, defendant states that he has not written to Judge Edmund L. Palmieri of this Court because "Hon. Judge Palmieri has been asked by me on several occasions to disqualify himself on the grounds of personal bias and prejudice against me."

Defendant has characterized as "the typical American provincial attitude" the statement by Referee Gelb (who presided over the New York State Court disbarment proceedings against defendant) that defendant could have obtained documentation to effect his earlier return from Brazil.

In a series of communications, defendant has attacked the writer of this opinion. In letters to Circuit Judge Medina, defendant criticized this Court for "*sui generis* innovation" and "'bastardizing' of accepted procedure" (Defendant's letter of April 21, 1968); has stated that this Court is "in a true sense a defendant or adversary in this proceeding" (Letter of April 21, 1968); and has stated that " * * * I fear his Honor will wish to inflict some further detention here [Bellevue Hospital] under what his Honor thinks are unpleasant circumstances" (Defendant's letter of May 10, 1968).

In a letter to Chief Judge Sugarman, defendant has accused this Court of "grand larceny" because defendant's personal property is, in his own words, "apparently in the personal and illegal custody of Hon. Judge Herlands." Defendant threatens to institute a replevin or conversion action in "State Courts or other forums" (Defendant's letter of April 24, 1968).

Defendant has accused this Court of "manoeuering [sic], if not actually tricking, counsel into concessions and admissions * * *" (Defendant's "Memorandum to Counsel", dated March 13, 1968, attached as Exhibit 1 to Defendant's Motion to Relieve Legal Aid) and of "arbitrary and capricious action" (Defendant's letter to this Court, dated May 12, 1968). He has referred to the proceedings before this Court as "this farce" and has asked this Court to " * * * admit the prejudice against

me [him] and disqualify your Honorable self" (Defendant's letter to this Court, dated May 12, 1968). In his affidavit, sworn to March 7, 1968, paragraph 88, defendant states that he considers "this Trial Court" to be "my [his] adversary" and he suggests that the Court is "the Coach or Captain of the prosecution."

Aside from his manifest disrespect for the judicial authorities, defendant's calculated tactics are transparent attempts to make it appear that the past and present legal proceedings against him are part of some sinister personal vendetta. His studied plan of campaign is based on the hope that his judge-baiting may provoke the Court into saying or doing something that may lend some superficial aspect of verisimilitude to his charges of bias and prejudice on the part of this Court and other judges.

On April 10, 1968, he elected in writing to proceed *pro se,* but when he was directed by the Court to answer questions concerning his alleged condition of narcolepsy (before the Court would decide his *pro se* application), he refused to take the stand, refused to answer questions and declared that he would not accept the Court's rulings on the propriety of the questions. (Post-Trial Minutes, pp. 1955–1964, 1972–1974, 1975–1982).

With regard to his election to proceed *pro se* when questioned about this subsequently, he said that he had simply elected to proceed *pro se* in order to "call" the Court's "bluff". The colloquy took place as follows:

"THE DEFENDANT: * * * It was no small decision on my part to agree to go ahead and represent myself under conditions that I wasn't able to foretell what they would be, as far as assistance, as far as mechanical assistance, as far as facilities, as far as getting access to things were concerned. I decided that it wouldn't happen, and I took the chance to what I would say in vulgar language, call a bluff.

"THE COURT: You took a chance on what?

"THE DEFENDANT: On the fact that it wouldn't happen.

"THE COURT: What wouldn't happen?

"THE DEFENDANT: That I wouldn't be given the opportunity." (Post-Trial Minutes, pp. 2108–9).

When, earlier this month, he was transferred by order of this Court to Bellevue Hospital Center for a phsyical and psychiatric examination, he refused to submit to a physical examination and refused to answer the doctors' questions that sought to elicit any relevant medical history. (Report, dated May 17, 1968, by Professor Morris Herman and Dr. Martin I. Lubin to Judge William B. Herlands).

This defiance of the law and disrespect for legal process has evidentiary significance on the issue presently before the Court as to the likelihood of his appearing when required.

Defendant's attitude of defiance of legal process and disrespect towards the Court runs counter to his counsel's standards of professional ethics and conduct. Because counsel have been deferential and courteous to the Court and have conducted themselves in a lawyer-like fashion, defendant is sharply critical of them.

If defendant does not prevail in persuading his attorneys to follow his views, he by-passes them and submits papers without their approval directly to the Court. For example, the affidavit of defendant, sworn to March 7, 1968, submitted as a supplemental affidavit in support of defendant's bail motion concludes with the following sentence:

"I feel I should also state that Mr. Sandler went over this affidavit briefly with me and it does not have his approval."

Defendant has insisted in writing letters to the Court despite the Court's statements that it does not wish to deal

directly with defendant but only through counsel.

The foregoing discussion demonstrates beyond a shadow of doubt that defendant regards himself as superior to the law, the Courts and his lawyers; that he is disrespectful and defiant of legal authority; and that this deeply ingrained attitude operates as a motivating force to such a demonstrated extent in shaping defendant's behavior that the Court is convinced that defendant will do whatever he regards as expedient to suit the exigencies of the moment. This includes flight and prolonged absence from this jurisdiction.

Since, as his history shows, he is capable of leaving this country on short notice and readily establishing himself as a "permanent resident" elsewhere, there is not the slightest assurance—particularly when now he is faced with the possibility of severe punishment—that he will be amenable to process as required.

### FINDINGS OF FACT

1. No conditions of release will reasonably assure that defendant will not flee.

2. After defendant had been duly subpoenaed on October 4, 1957 at La-Guardia Airport to appear on October 7, 1957 as a witness in Securities and Exchange Commission v. Swan-Finch Oil Corporation, et al., he proceeded to Havana, Cuba where he landed on October 7, 1957. Feigning illness, he failed to return to the United States on October 7, 1957 and did not return until April 1964, except for three surreptitious visits.

3. In 1958, when he was admittedly well enough to travel, defendant deliberately avoided returning to the United States, except for three clandestine visits. These visits were made surreptitiously in order to evade a bench warrant issued by Judge Sugarman.

4. On July 12, 1959, four days after wide publicity had been given to the fact of his indictment by a New York County Grand Jury, defendant left Portugal to reside in Brazil, for the purpose of enjoying extradition-free status there.

5. Defendant deliberately failed to return to the United States between July, 1959 and April, 1964.

6. As a consequence of the jury verdict of guilty on December 28, 1967, defendant was found guilty on eleven counts of the indictment herein; and the total maximum punishment receivable by defendant, if consecutive sentences are imposed, is fifty-five years and a $60,000 fine. Unless the verdict is set aside as the result of currently pending and undetermined post-conviction proceedings, the possibility of such severe punishment constitutes a strong incentive and motive on the part of defendant to flee this jurisdiction.

7. Defendant's incentives and motives to flee have so radically increased in view of the foregoing circumstances that his record of appearances between July 1965 (when he was first released on bail) and December 28, 1967 (the date of the verdict) provides no reasonable basis for concluding that he will continue to appear as required.

8. Past and current attempts on the part of defendant to explain away his failure to appear as a witness on October 7, 1957; his feigned illness in Cuba; his three surreptitious visits to the United States; his permanent residences in Canada, Cuba and Brazil; his protracted stays in foreign countries until April 1964; are replete with incredible, false and misleading representations and reveal that he is a person who has displayed the ability readily to manipulate documents and proceedings to pervert the truth and to camouflage the nature of his activities. The affidavits and exhibits before the Court demonstrate clearly and convincingly that he has not hesitated to deceive his own doctor and his own lawyer as well as the Court in order to fabricate alibis for his evasion of legal process.

### CONCLUSIONS OF LAW

1. The Court has reason to believe that no one or more of the conditions of

release [specified in 18 U.S.C.A. § 3146 (a)] will reasonably assure that defendant will appear as required and that defendant will not flee. 18 U.S.C.A. § 3148. The credible evidence establishes clearly and convincingly that there is a substantial risk of defendant's flight.

2. The Court is authorized to order that defendant's detainer and remand, originally directed on December 28, 1967, shall be continued; and defendant is hereby ordered detained and remanded without bond pending the imposition of sentence. 18 U.S.C.A. § 3148.

3. The Court adheres to its remand order of December 28, 1967. Defendant's present motion has been treated both as a motion for reargument as well as an independent motion. F.R.Cr.P. 32(a). Leave for reargument having been granted, the motion is otherwise denied in all respects.

So ordered.

See also D.C., 286 F.Supp. 869.