SUPERIOR COURT
OF THE

E. SCOTT BRADLEY
JUDGE

1 The Circle, Suite 2
GEORGETOWN, DE 19947

March 19, 2020

Kenneth T. Kristl, Esquire
Environmental & Natural Resources
Law Clinic
Widener University Delaware Law
School
4601 Concord Pike
Wilmington, DE 19803

Devera B. Scott, Esquire
Kayli H. Spialter, Esquire
State of Delaware
Department of Justice
102 W. Water Street, Third Floor
Dover, DE 19904

R. Judson Scaggs, Jr., Esquire
Barnaby Grzaslewicz, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

Re:  *Keep Our Wells Clean, et al. v. Department of Natural
     Resources and Environmental Control, et al.*
     Case No. S19A-07-002-ESB

Dear Counsel:

This is my decision on the appeal filed by Appellant Keep Our Wells Clean

("KOWC")[1] of the Environmental Appeals Board's decision affirming the decision

by the Secretary of Appellee Department of Natural Resources and Environmental

---

[1] Eight individuals are also Appellants.

Control ("DNREC") amending the construction permit issued by DNREC to Appellee Artesian Wastewater Management, Inc. ("Artesian") on October 15, 2017 for the construction of Phase 1 of the Artesian Northern Sussex Regional Wastewater Recharge Facility ("ANSRWRF") northwest of Milton, Sussex County, Delaware.

ANSRWRF was to be built in three phases and have a wastewater treatment plant, three lagoons to store wastewater, treat up to three million gallons of domestic wastewater per day, and spray the treated domestic wastewater on agricultural lands. ANSRWRF was approved by DNREC under regulations adopted by it in 1999 (the "1999 Regulations"). As part of the approval process, Artesian submitted hydrogeologic and soil investigation reports to DNREC. DNREC approved those reports under the 1999 Regulations. DNREC adopted new regulations in 2014 (the "2014 Regulations"). The 2014 Regulations continue to require hydrogeologic and soil investigation reports; however, the hydrogeologic report required by the 2014 Regulations would require more test wells to be drilled than Artesian drilled previously under the 1999 Regulations.

The demand for domestic wastewater never materialized. Artesian filled the void by agreeing to take treated food processing wastewater from a chicken processing plant and spray it on the agricultural lands. Artesian filed an

2

application on May 10, 2017 with DNREC to amend its construction permit to address the change from domestic to food processing wastewater, and to reconfigure and delay some aspects of ANSRWRF. The amended application did not include new hydrogeologic and soil investigation reports. The Secretary and the Environmental Appeals Board ("EAB") approved the amendments to Artesian's construction permit, concluding that the changes were not significant enough to require new hydrogeologic and soil investigation reports and to start the approval process from the beginning. I have concluded that the Secretary and EAB were correct because the applicable provisions of the 2014 Regulations do not require Artesian to obtain a new permit for two reasons. First, Artesian already has a permit. Second, the changes that Artesian wants to make to its permit are, as the Secretary and EAB found, not substantial enough to require new hydrogeologic and soil investigation reports.

<u>ANSRWRF</u>

ANSRWRF, as originally approved by DNREC, would initially treat domestic wastewater from the Elizabethtown housing project located northwest of Milton and ultimately serve the wastewater needs of the surrounding area. ANSRWRF was to consist of a wastewater treatment plant and three lagoons with storage for 159 million gallons of wastewater on a 75 acre parcel of land, be

3

capable of treating three million gallons of wastewater per day, and spraying the treated wastewater on agricultural lands totaling 1722 gross acres (actual spray area of 1326.5 acres). ANSRWRF was to be constructed in three phases. Phase 1 would (1) have a wastewater treatment plant and two lagoons with storage for 67.5 million gallons of wastewater; (2) process one million gallons of wastewater per day; and (3) spray the treated wastewater on 608.9 acres of agricultural lands.

ANSRWRF was approved by DNREC under the 1999 Regulations. DNREC adopted the 2014 Regulations on January 11, 2014. The Elizabethtown housing project was apparently never built. However, Artesian located a new customer. Artesian and Allen Harim Foods, LLC ("Allen Harim") entered into an agreement whereby treated food processing wastewater from Allen Harim's Harbeson chicken processing plant would be sent via a pipeline to ANSRWRF. Artesian would store and then spray the already-treated wastewater on the existing agricultural lands that it had already leased. Allen Harim had previously been discharging its treated wastewater directly to "Beaverdam Creek," a stream about three miles from Milton, Sussex County, Delaware.

Artesian filed an application to amend its Phase 1 construction permit with DNREC on May 10, 2017. The application included an amended Design Development Report ("DDR"), which Artesian submitted to account for the

4

changes in the anticipated influent flow characteristics and phasing of treatment and disposal capacity. The amendment sought to (1) move construction of the wastewater treatment plant from Phase 1 to Phase 2; (2) build one 92 million gallon storage lagoon in Phase 1 instead of two lagoons totaling 67.5 million gallons; (3) accept and dispose of 1.5 million gallons to 2.0 million gallons of already-treated food processing wastewater per day instead of accepting and treating 1.0 million gallons of domestic wastewater per day (but still less than the 3.0 million gallons of discharge per day for all three phases); and, (4) dispose of the already-treated food processing wastewater, instead of the domestic wastewater, by spray irrigation on 961.1 gross acres (762.7 spray acres).

The 2014 Regulations require a Hydrogeologic Suitability Report ("HSR") and a Surface Water Assessment Report ("SWAR"). Artesian had, before obtaining the initial DNREC approval for ANSRWRF, submitted, among other things, (1) a Site Selection and Evaluation Report, dated January 10, 2007, that was reviewed and approved by DNREC, in which DNREC concluded that the proposed sites for spray irrigation met the current criteria for land treatment systems; and (2) a Design Development Report, dated June 19, 2002, which included a Soil Investigation Report prepared by Brickhouse Environmental and a Hydrogeologic Investigation Report and Preliminary Groundwater Mounding

5

Analysis prepared by Artesian Utility Development, Inc. DNREC approved the DDR, which was amended with subsequent supporting documentation, on April 29, 2010. Artesian submitted construction plans on October 27, 2011. DNREC issued the construction permit to Artesian on October 15, 2013.

Artesian did not submit an HSR and SWAR with its application for an amended construction permit on May 10, 2017. The application went to DNREC's Division of Water, Groundwater Discharge Section ("GWDS"), which determined that the application was administratively complete even though it did not include an HSR and SWAR. A public hearing was held on July 27, 2017. GWDS recommended approval of the application, reasoning, in part, that ANSRWRF would have the highest treatment level required for spray irrigation. The hearing officer, in a report dated October 5, 2017, recommended that the Secretary issue the amended construction permit for Phase 1. The Secretary issued an Order approving the amended application on November 2, 2017. The Secretary's decision noted that Artesian must meet the public access criteria for spraying treated wastewater on the ground, which is the highest criteria for spray irrigation. The Secretary also addressed what he considered to be the application's three most significant changes, concluding that an increase in the Phase 1 storage capacity from 62 to 90 million gallons, delaying construction of the wastewater

6

treatment plant to Phase 2, and increasing the use of agricultural lands to reflect Allen Harim's volume of already-treated food processing wastewater were reasonable and well-supported in the record. KOWC then filed an appeal of the Secretary's decision with the EAB.

## The EAB Decision

The EAB held public hearings on May 22, 2018 and March 12, 2019. The issue of whether DNREC should have required Artesian to file an HSR and SWAR before DNREC considered Artesian's amended application was squarely before the Board. The Board heard from two witnesses, John G. Hayes, Jr. and Christopher P. Grobel, Ph.D. Hayes is DNREC's Program Manager for the Large Systems Branch, Ground Water Discharge Section. Grobel is an expert in hydrology and hydrogeology.

## Summary of Hayes' Testimony

Hayes (1) was familiar with ANSRWRF as originally approved and with the proposed amendments to the Phase 1 Construction Permit; (2) was familiar with the 2014 Regulations; (3) knew that no HSR and SWAR had been filed with the amended application; (4) believed that only a *new* application required a HSR and SWAR; (5) believed that an existing permit could be amended; (6) believed that the proposed changes to the construction permit were not significant enough to

7

require a new application; (7) believed that the site was still suitable for the disposal of treated wastewater; (8) believed that Artesian had submitted everything that is was obligated to submit; (9) believed that the volume of the wastewater to be sprayed on the agricultural fields of 1.5 to 2.0 million gallons per day was less than the overall 6 to 7 million gallons per day that for which the site was suitable; (10) recognized that although domestic wastewater and the treated wastewater from Allen Harim contained different components, the differences were not significant enough to require a new permit; and (11) recognized that Allen Harim was treating its wastewater to a higher level than was required for spray irrigation because it was being stream discharged and that Allen Harim would continue to treat its wastewater to that higher level before it was sent to ANSRWRF.

## Summary of Grobbel's Testimony

Grobbel testified about some of the issues in the permitting process, but his testimony was stopped because the EAB concluded that the evidence presented to the EAB would be limited to proper site selection and design, and not operation of the wastewater treatment plant.

## The Board's Summary of the Evidence

On the issue of whether the 2014 Regulations required Artesian to submit a HSR and SWAR, the EAB noted the following testimony from Hayes:

(1) Hayes was involved in DNREC's issuance of the 2013 and 2017 permits and knew what they allowed;

(2) Hayes knew that the regulations changed between the issuance of the 2013 and 2017 permits and he was involved in the development of the new regulations;

(3) Hayes stated that the site selection process was not part of the amendment to the 2013 permit and based on the proposed changes there was no need to apply all of the 2014 Regulations to the amended application;

(4) Hayes reviewed the soil report submitted with the 2013 permit and concluded that no additional soil work was necessary;

(5) Hayes said that the requirements for a HSR and SWAR apply to new applications, not existing ones;

(6) Hayes said that subsections 6.3.1.1.14 and 6.5.3.3.1 of the 2014 Regulations allow DNREC to amend a permit;

(7) Hayes said the volume of water to be sprayed on the fields was within the scope of the investigations that were previously performed; and

(8) Hayes said that DNREC had the functional equivalent of a HSR and SWAR even though they were not required for an amended permit.

### The EAB's Legal Conclusions

The EAB reached, in part, the following legal conclusions:

> The Board agrees with DNREC and Artesian's contention that, as a matter of law, the 2014 regulations do not apply to the amendment to the existing construction permit. DNREC concluded that a permit amendment is subject to the regulations that were in effect at the time of the initial permit application unless the changes are significant. In this case DNREC determined the changes are not significant enough to require the application to submit a new permit application. DNREC's determination is not unreasonable or clearly wrong.
>
> The Board agrees with Artesian's contention, and finds as a matter of law, that it submitted the required plan, specifications and design engineer report contemplated by subsection 6.3.1.1.14. Lastly, the Board finds as a matter of fact that the Sussex County zoning approval allowed for a regional wastewater facility to serve multiple sources and that Sussex County was aware of the amended construction permit application and reaffirmed its conditional use approval. The Board finds as a matter of law that the Secretary had sufficient evidence to so conclude.

10

## Standard of Review

This Court's review of administrative board decisions is limited to whether the decision is supported by "substantial evidence" and is "free from legal error."[2] "Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion."[3] It is not the Court's role to "weigh the evidence, determine questions of credibility or make its own factual findings."[4] The Court "merely determines if the evidence is legally adequate to support the agency's factual findings."[5]

## Regulatory Construction

When interpreting the language of the 2014 Regulations, I have to engage in regulatory construction, the functional equivalent of statutory construction. "The primary goal of statutory construction is to 'ascertain and give effect to the intent of the legislature.'"[6] Intent is determined by the plain language of the statute, and absent

---

[2]*State v. Calder*, 2019 WL 5381918, at *2 (Del. Super. Oct. 16, 2019).

[3]*Liberty Mut. Ins. Co. v. Silva-Garcia*, 2013 WL 4507847, at *4 (Del. Super. Aug. 22, 2013).

[4]*Lewis v. State Dep't of Agriculture*, 2007 WL 315359, at *3 (Del. Super. Jan. 31, 2007).

[5]*Id.*

[6] *Acadia Brandywine Town Ctr., LLC v. New Castle Cty.* 879 A.2d 923, 927 (Del. 2005) (citing *Dir. Of Revenue v. CNA Holdings, Inc.*, 818 A.2d 953, 957 (Del. 2003)); see also Norman J. Singer, *Sutherland Statues and Statutory Construction*, §78:3 (7th ed. 2015) ("The key to interpreting a ... statute is to ascertain and effectuate legislative intent as expressed in the statute. The statute's language is the best and most reliable index of the statute's meaning ....").

11

ambiguity, "there is no room for judicial interpretation and 'the plain meaning of the statutory language controls.'"[7] Indeed, "[i]n the absence of any ambiguity, the language of the statute must be viewed as conclusive of the legislative intent. The judicial role is then limited to an application of the literal meaning of the words."[8] Absent ambiguity, the Court cannot look to legislative history to determine the meaning of the legislative enactment.[9] There is one other rule of statutory construction that is applicable. The expression of one thing but not another is interpreted to mean that omitted items were not meant to be included.[10]

## Discussion

The difficult task in this case is to determine if DNREC correctly processed amendments to a 2013 construction permit that was approved under the 1999 Regulations where those amendments are now governed by - at least to some

---

[7] *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust,* ex rel. *Christiana Bank and Trust Co.,* 28 A.3d 1059, 1070 (Del. 2011); see also Norman J. Singer, *Sutherland Statutes and Statutory Construction,* §46:1 (7th ed. 2015) ("the rules of statutory construction favor according statutes with their plain and obvious meaning and courts assume the legislature knew the plain and ordinary meanings of the words it chose to include in a statute.").

[8] *Grand Ventures, Inc. v. Whaley,* 632 A.2d 63, 68 (Del. 1993) (internal citation omitted).

[9] *Arnold v. Society for Sav. Bancorp., Inc.,* 650 A.2d 1270, 1287 (Del. 1994) ("A court should not resort to legislative history in interpreting a statute where statutory language provides unambiguously an answer to the question at hand."); *Pellicone v. New Castle Cty.,* 88 A.3d 670, 675, n.21 (Del. 2014).

[10] *See, e.g., Walt v. State,* 727 A.2d 836, 840 (Del. 1999), *citing Hickman v. Workman,* 450 A.2d 338, 391 (Del. 1982).

extent - the 2014 Regulations.[11] Artesian argues that it did not have to start the approval process for a wastewater treatment system from the beginning because (1) it already had a permit to construct a wastewater treatment system, and (2) the changes that it wanted to make to its already-approved wastewater treatment system were not significant enough to require any further hydrogeologic and soil evaluations. DNREC and the EAB agreed with Artesian. KOWAC argues that Artesian had to start the process over because the 2014 Regulations require it. The 2014 Regulations do not, in my view, address this situation with the clarity that is required. The 2014 Regulations make great sense if you are starting the permitting process after they became effective, but that is not the case here. ANWRWRF was approved by DNREC under the 1999 Regulations. Artesian already has a construction permit that DNREC approved pursuant to those regulations. Nevertheless, the 2014 Regulations are what DNREC had to work with in processing the amendments to Artesian's construction permit. The resolution to

---

[11]The EAB appeared to state that the 2014 Regulations did not apply to Artesian's proposed amendments to its already-issued construction permit. Although the EAB decision is not a model of clarity, I find that the fairest view of the EAB's ruling, when you consider the issues before it and its factual findings, is that the EAB found that the sections of the 2014 Regulations requiring a HSR and SWAR do not apply, that Artesian complied with Section 6.3.1.14.1, and that the changes that Artesian sought were not substantial enough to require further hydrogeologic and soil evaluations. (The EAB's reference to Section 6.3.1.1.14 instead of 6.3.1.14.1 appears to be a typographical error.)

13

the parties' arguments turns on the language of three sections of the 2014

Regulations: Sections 6.1, 6.5 and 6.3.1.14.1.

### Large System Approvals

The 2014 Regulations govern Small Systems and Large Systems for treating

and disposing of wastewater. ANSRWRF is a Large System. Large Systems are

governed by Section 6.0, *et seq.* Section 6.1 states, in part, as follows:

> A permit must be obtained from the Department
> prior to the construction, operation, maintenance or
> repair of any on-site wastewater treatment and disposal
> systems with daily design flow rates of $\geq$ 2,500 gallons.

There are, of course, many things you would have to do in order to get a

permit for a Large System. You would, if you were starting the process from the

very beginning, have to submit to DNREC an HSR and a SWAR. An HSR and a

SWAR are discussed in Sections 6.2.3 and 6.2.4, respectively, and are required by

Section 6.5.

### HSR

An HSR is defined by the 2014 Regulations and "means a report that

characterizes the hydrogeologic properties present on a given site through direct

observations." Section 6.2.3 states that an HSR "must be submitted to the

Department for review and approval for large on-site wastewater treatment and

disposal systems." Hydrogeologic or hydrogeology is an area of geology that deals with the movement and distribution of groundwater in the soil.

## SWAR

SWAR is defined by the 2014 Regulations and "means a report that characterizes the potential nutrient impacts of a wastewater treatment system to a site from future development through background data and computer modeling." Section 6.2.4 states that a SWAR "must be submitted to demonstrate that nutrient performance standards for wastewater are being met at the post treatment location of a large on-site system or through natural attenuation processes prior to reaching the closest receiving surface water body in order to comply with surface water quality standards."

The information that must be included in an HSR and a SWAR, as well as the manner in which that information must be collected, are discussed in detail in the appropriate sections of the 2014 Regulations. Although those two reports are apparently of great consequence, they were not discussed in much detail before the EAB. Indeed, the only notable difference between the Soil Investigation Report and Hydrogeologic Investigative Report submitted by Artesian in 2002 and what an HSR would require now involves the number of test borings done. Artesian previously did 13 test borings over 1652 acres. An HSR would require around

15

160 test borings. The test borings are required to gather data to assess the suitability of the agricultural lands for the disposal of wastewater. I understand, of course, that getting more information could conceivably change the analysis, but that is purely speculative at this point.

The requirement to obtain an HSR and SWAR is found in Section 6.5, which states as follows:

> In order to obtain a permit to construct and operate an on-site wastewater treatment and disposal systems with daily flow rates of $\geq$ 2,500 gallons, a permit application must be submitted to the Department for review and approval. A permit application will not be reviewed by the Department until the SIR, HSR and SWAR have been reviewed and approved by the Department.

### The Applicability of Sections 6.1 and 6.5

If Sections 6.1 and 6.5 apply to Artesian's proposed amendments to its already-issued construction permit, then Artesian would have to provide an HSR and SWAR because they are clearly part of the application to obtain a permit for a Large System. However, Sections 6.1 and 6.5 do not nicely fit this case because Artesian already has a construction permit. Artesian argues that Sections 6.1 and 6.5 do not apply because it already has "obtained" a construction permit and the changes it wants to make to its permit are not substantial enough to justify starting

16

the process over from the very beginning. Artesian also argues that Section 6.1 and 6.5 instead only apply to applications for new permits. KOWAC argues that Sections 6.1 and 6.5 apply even though Artesian already has a construction permit.

I conclude that Sections 6.1 and 6.5, by their clear language, do not apply. Section 6.1 states that "a permit must be *obtained* from the Department prior to the construction, operation, maintenance or repair of any on-site wastewater treatment and disposal system..." Section 6.5 states that "[i]n order to *obtain* a permit to construct and operate on-site wastewater treatment and disposal system" you must submit an HSR and a SWAR to the Department. Artesian had *already* "obtained" a construction permit for Phase 1, making it unnecessary for Artesian to start the process from the very beginning and obtain yet another construction permit. Since I have concluded that Sections 6.1 and 6.5 do not apply, then the obligations to submit an HSR and a SWAR do not apply either. Thus, the question becomes what regulatory and analytical steps one has to follow to process changes to an already-issued permit. Changes to construction permits are addressed in Section 6.3.1.14.1.

17

## Construction Permit Changes

Section 6.3.1.14.1 states:

> A construction permit application, plans and
> specifications and design engineer report with applicable
> fees must be submitted to the Department if the
> construction permit has expired or changes have
> occurred.

Artesian argues that it has complied with 6.3.1.14.1. Artesian's 2013 construction permit for Phase 1 has not expired. However, Artesian does want to make changes to its construction permit, and the 2014 Regulations permit a construction permit holder to make changes to the permit if "changes have occurred." Artesian has submitted to DNREC an amended Design Engineer Report and plans and specifications and paid the applicable fees in connection with its application for an amended construction permit. KOWAC argues that Section 6.3.1.14.1 means that an applicant who has gotten a construction permit under Sections 6.1 and 6.5 and wants to make changes would have already submitted an HSR and a SWAR as part of its original application. Thus, KOWAC reasons, any hydrogeologic and soil studies that are needed would already have been done. KOWAC's argument, of course, assumes that the original application was filed after the 2014 Regulations became effective, but that is not the case here.

I certainly understand KOWAC's argument, but it describes a situation that is not before us. Artesian and DNREC are dealing with a wastewater system that crosses different regulations enacted at different times. I conclude that Section 6.3.1.14.1, by its clear language, allows Artesian to seek an amendment to its existing construction permit. Section 6.3.1.14.1 sets forth a process that must be followed if "changes have occurred." Artesian's situation has changed and it wants to process those changes by submitting the required documentation and having those changes evaluated by DNREC. Unfortunately, the 2014 Regulations do not define or address what a "change" either means or, more importantly, what Artesian has to do in order to obtain the necessary DNREC approval.

## Processing the Changes

Faced with this, the Secretary, and ultimately the EAB, concluded that the 2014 Regulations did not require Artesian to submit a HSR and SWAR with its application for an amended construction permit because the changes that Artesian wanted to make to ANSRWRF were not substantial enough to require Artesian to conduct additional hydrogeologic and soil studies. Put another way, the Secretary, based on the nature of Artesian's proposed changes and the hydrogeologic and soil studies done in 2002, concluded that no further environmental work was necessary. The EAB agreed with the Secretary's conclusion. I conclude that the

19

EAB's decision is a correct statement of the applicable law and is supported by substantial evidence in the record. The following are the changes that Artesian sought, and the rationale followed by the Secretary, and ultimately the EAB, in approving them.

## The Wastewater Treatment Plant

Artesian sought to move construction of the wastewater treatment plan from Phase 1 to Phase 2. It would still be built on the same 75 acre parcel, but would be built later. The only change was one of timing. The Secretary and EAB found that there would be no adverse environmental consequence for doing this. Indeed, the Secretary found that the delay in construction would reduce the impact of the effect of construction on the amount of the land disturbed by the construction. That conclusion is supported by the record. Artesian has approval to build a wastewater treatment plant. Whether it is built now or later is irrelevant from an environmental viewpoint.

## The Lagoons

Artesian sought to build one 90 million gallon lagoon in Phase 1 instead of two lagoons totaling 67.5 million gallons. The larger lagoon was necessary to handle the increased flow of treated wastewater from Allen Harim. This lagoon would still be on the same 75 acre parcel of land and the 90 million gallon lagoon

would be less in size than the three lagoons totaling 159 million gallons for the entire project. The Secretary and the EAB found that there would be no adverse environmental consequence for doing this. The only effect was to increase the land disturbance related to the construction of the larger lagoon initially. That conclusion is supported by the record. The fact that Artesian is building more storage capacity sooner rather than later is irrelevant from an environmental viewpoint.

## The Allen Harim Wastewater

Artesian sought to accept up to 1.5 to 2.0 million gallons per day of already-treated food processing wastewater from Allen Harim instead of 1.0 million gallons of untreated domestic wastewater. The Secretary and EAB concluded that Allen Harim's already-treated wastewater would not contaminate the groundwater used for the drinking supply because of DNREC's public access standard, which is the highest standard that one must meet in order to spray treated wastewater on agricultural land. Put another way, in order to spray Allen Harim's already-treated wastewater on agricultural land, Artesian and Allen Harim would have to meet the appropriate standard for doing so. Moreover, the treated wastewater would be sprayed on lands that DNREC long ago deemed suitable for spray irrigation. The volume from Allen Harim is still less than the contemplated treatment and disposal

21

of 3.0 million gallons of treated wastewater for a site that was, according to Hayes, suitable for the disposal of 6 to 7 million gallons of wastewater per day. Moreover, also according to Hayes, Allen Harim would continue to treat its wastewater to a standard higher than is required for spray irrigation on agricultural fields. As I noted before, Allen Harim treats its wastewater to a level high enough to allow it to be discharged directly into a waterway. The Secretary increased the total spray acres from 608.9 to 762.7 acres, presumably to allow for the increase in wastewater.[12] Hayes was well aware of the characteristics of the site and he knew that Allen Harim's food processing wastewater had different components than domestic wastewater, but did not feel that the differences were significant enough to require a new permit. The Secretary's conclusions are supported by the testimony of Hayes and there does not appear to be any evidence in the record to contradict the Secretary's conclusions. The Secretary found that there would be no adverse environmental consequence for the changes sought by Artesian in this regard. Indeed, the fact that Allen-Harim's wastewater is to be disposed of on agricultural lands instead of directly into a waterway is arguably better because the land further "treats" the wastewater.

---

[12]One of the fields - Field D, consisting of 90.7 acres - may not be used until it is approved by Sussex County as a conditional use.

## Conclusion

I find that the Secretary and EAB were correct when they found that the 2014 Regulations do not require Artesian to start the process from the beginning because it already had "obtained" a construction permit for Phase 1 of ANSRWRF. I further find that the Secretary and EAB were correct when they concluded that the changes Artesian sought to make to its already-issued construction permit were not substantial enough to require further hydrogeologic and soil studies. The changes involving the timing of the construction of the wastewater treatment plant, sizing of the lagoons, and spraying of treated food-processing wastewater were all well within the previously-approved parameters for ANWRWRF. The evidence in the record supports the conclusions by the Secretary and EAB that the proposed changes would have no effect on the drinking water. KOWAC's argument that Artesian's proposed changes to its construction permit require it to start the process from the beginning, even though Artesian already has a construction permit, ignores the plain language of the 2014 Regulations and the evidence in the record indicating that the proposed changes would have no effect on the drinking water in the area. There are certainly some changes to an existing construction permit that *would* justify additional testing. For example, an increase in disposal of wastewater beyond what the agricultural

23

lands had been approved for would arguably require more analysis. However, that is not the case here. The agricultural lands to be used in this case have been extensively studied and found suitable for spray irrigation. Quite simply, the poultry industry has been in Sussex County for a long time, and so has the spraying of treated food processing wastewater from a poultry plant on agricultural lands. The record in this case supports the findings and decisions by the Secretary and EAB. There is little to nothing in the record to support KOWAC's arguments. Accordingly, I affirm the Environmental Appeals Board's decision.

IT IS SO ORDERED.

Very truly yours,

E. Scott Bradley

ESB/tll

cc:    Prothonotary

FILED PROTHONOTARY SUSSEX COUNTY 2020 MAR 19 P 12: 01